JONATHAN E. NUECHTERLEIN
General Counsel

ANGELEQUE P. LINVILLE, Tex. Bar No. 24058793
JASON C. MOON, Tex. Bar No. 24001188
ANNE D. LEJEUNE, Tex. Bar No. 24054286
EMILY B. ROBINSON, Tex. Bar No. 24046737
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9381; alinville@ftc.gov (Linville)
(214) 979-9378; jmoon@ftc.gov (Moon)
(214) 979-9371; alejeune@ftc.gov (LeJeune)
(214) 979-9386; erobinson@ftc.gov (Robinson)



Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

**SEALED**

| | |
|---|---|
| **Federal Trade Commission;**<br><br>Plaintiff,<br><br>v.<br><br>**Vemma Nutrition Company**, a corporation;<br>**Vemma International Holdings, Inc.**, a corporation;<br>**Benson K. Boreyko** a/k/a **B.K. Boreyko**, individually and as an officer of Vemma Nutrition Company and Vemma International Holdings, Inc.; and<br>**Tom Alkazin**, an individual;<br><br>Defendants, and<br><br>**Bethany Alkazin**, an individual;<br><br>Relief Defendant. | CV-15-01578-PHX-JJ<br>No. _____<br><br>**CERTIFICATION AND DECLARATION OF PLAINTIFF'S COUNSEL ANGELEQUE P. LINVILLE IN SUPPORT OF PLAINTIFF'S: (A) *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER; AND (B) *EX PARTE* MOTION TO SEAL**<br><br><br>**UNDER SEAL** |

I, Angeleque P. Linville, declare as follows:

1. I am over 21 years old and am a citizen of the United States. I am an attorney for the Plaintiff, Federal Trade Commission (FTC). Unless otherwise noted, the following facts are personally known to me.

2. I am an active member in good standing of the State Bar of Texas. My business address is 1999 Bryan Street, Suite 2150, Dallas, Texas 75201.

3. I submit this certification and declaration pursuant to Rule 65(b)(1)(B) of the Federal Rules of Civil Procedure in support of the FTC's request that the FTC's proposed Temporary Restraining Order and Order Temporarily Sealing Case be issued without notice to Defendants.

4. The FTC has not given Defendants notice of the action against them and has not communicated with Defendants concerning the FTC's investigation or request for *ex parte* relief. As set forth below, there is good cause to issue a temporary restraining order and order temporarily sealing the case without notice to Defendants.

### Irreparable Harm

5. This Court may issue a temporary restraining order without notice to Defendants "only if specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The FTC's evidence makes such a showing.

6. Irreparable harm may be presumed in a statutory enforcement action brought by a law enforcement agency. *United States v. Odessa Union Warehouse Coop.*, 833 F.2d 172, 176 (9th Cir. 1987); *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984). "No specific or immediate showing of the precise way in which violation of the law will result in a public harm is required." *Odessa Union Warehouse Coop.*, 833 F.2d at 175.

## Defendants' Deceptive Business Practices

7. The FTC has filed an *Ex Parte* Application for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, and Other Equitable Relief, and an Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Application for TRO") and Memorandum in Support thereof. The Application for TRO and Memorandum in Support are supported by more than 1400 pages of accompanying evidence, including corporate records, advertising and marketing materials, and copies of 48 recorded sales presentations and conferences.

8. The evidence filed in this action demonstrates that Defendants: (a) operate an illegal pyramid scheme;[1] (b) falsely represent that members of the Vemma program ("Affiliates") are likely to earn substantial income;[2] (c) fail to disclose, or disclose adequately, that Vemma's structure ensures that most consumers who become Vemma Affiliates will not earn substantial income; and (d) provide the means and instrumentalities for the commission of deceptive acts and practices by furnishing Vemma Affiliates with promotional materials that contain false and misleading representations to be used in recruiting new participants.[3]

9. Defendants have operated their unlawful pyramid since at least 2004.[4] Defendants operate in over 50 countries[5] and have caused hundreds of millions of dollars in consumer injury.[6] Based on their past unlawful practices, Defendants are likely to continue their deceptive conduct unless enjoined by this Court.[7]

---

[1] *See, e.g.*, App. 936-51; App. 1378:2-1379:13; App. 1826; App. 1364:21-1366:21; App. 1371:5-6; App: 1825; App. 1549 ¶¶ 67-68 (Dr. Bosley).

[2] *See, e.g.*, App. 1158:9-12; App. 1225:16-18; App. 1228:22-1229:5; App. 1542:49.

[3] *See, e.g.*, App. 19-20 ¶ 48 (Thacker); App. 927-31.

[4] *See* App. 31; App. 74.

[5] App. 1283; 1646.

[6] *See, e.g.*, App. 7 ¶ 14 (Thacker); App. 1348:21-23; App. 1824; App. 1393:16-19; App. 1829.

[7] Defendants' past misconduct "gives rise to the inference that there is a reasonable likelihood of future violations." *CFTC v. Hunt*, 591 F. 2d 1211, 1220 (7th Cir. 1979);

10. Defendants violate Section 5(a) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45(a), and are likely to continue to violate Section 5(a) absent entry of an injunction. Immediate and irreparable injury, loss, or damage is likely to result if Defendants receive advance notice of this action.

### Prior Regulatory Action

11. Defendants have a history of deceiving consumers and have been investigated and sanctioned by authorities for their deceptive conduct. On February 5, 2014, Vemma was determined to be operating an illegal pyramid in Italy by the Italian Competition and Markets Authority ("Italian Authority").[8] In ultimately concluding that Vemma Italia operated a pyramid scheme, the Italian Authority found that "personal" orders (Affiliate Packs and auto-delivery orders) played "an absolute predominate role" in the program, as opposed to sales to third parties, and Affiliates' promotional efforts focused on constantly enrolling new Affiliates rather than product sales.[9] The Italian Authority fined Vemma Italia €100,000 and ordered it to cease its operations in Italy.[10] Despite the Italian Authority's clear ruling on the deceptive nature of their business practices, Defendants have continued their illegal scheme unabated.

### Possibility for Large Monetary Judgment

12. Defendants' illegal pyramid scheme has likely victimized hundreds of thousands or millions of consumers. The possibility of a large monetary judgment provides Defendants with ample incentive to conceal or dissipate otherwise recoverable assets. Courts have acknowledged that where business operations are permeated by deception there is a strong possibility that assets may be dissipated.[11]

---

*SEC v. R.J. Allen & Assocs.*, 386 F. Supp. 866, 877 (S.D. Fla. 1974).
[8] *See generally* App. 1611-1628.
[9] App. 1624:58-59.
[10] App. 1626:74.
[11] *See, e.g., SEC v. Manor Nursing Cntrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) ("Because of the fraudulent nature of [the] violations, the court could not be assured that [defendants] would not waste their assets"); *In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp.

4

### Connections to Foreign Jurisdictions and Transfers to Foreign Banks

13. Vemma and Vemma Holdings have connections to associated companies and bank accounts in foreign jurisdictions, including Kenya, China, Canada, Australia, Mexico, Taiwan, Singapore, and Vietnam.[12] These Defendants can easily transfer assets to these foreign bank accounts and have done so repeatedly.[13] Through his control over Defendants Vemma and Vemma Holdings, Defendant Boreyko can take advantage of these connections and accounts to dissipate assets.

### Comingling of Corporate Funds

14. Vemma and Vemma Holdings commingle funds, with one depositing the checks of the other, including state tax refund checks, and paying the other's credit card statements.[14]

### Defendants in FTC Cases Often Attempt to Conceal Assets

15. In the FTC's law enforcement experience, defendants who receive advance notice of the filing of an action by the FTC often immediately attempt to dissipate assets, as illustrated by the following examples, provided on information and belief:

    a. In *FTC v. Your Yellow Book*, CIV-14-786-D (W.D. Ok. 2014), the FTC received an *ex parte* temporary restraining order and asset freeze. Because defendants operated the business out of their home, the FTC requested, and was granted, a provision requiring a turnover of business documents, rather than immediate access to the business premises. After the bank mistakenly failed to freeze some of the defendants' accounts, one defendant withdrew nearly $30,000. Additionally, defendants attempted to delete nearly 3,000 business records from the business's computer before turning it over

---

2d 424, 426 (D. N.J. 1998) ("When . . . business operations are permeated by misrepresentations and fraud, the likelihood that assets may be dissipated during the pendency of the legal proceedings is strong.").
[12] App. 7 ¶ 14 (Thacker).
[13] *Id.*
[14] App. 8 ¶¶ 15, 19 (Thacker); App. 433-39.

to the FTC. The court later held defendants in contempt for these actions, finding that some of the money had been withdrawn with notice of the TRO and that the defendants had attempted to destroy evidence in violation of the TRO. Unfortunately, the FTC was unable to recover over $7,000 because defendants had lost that money at a casino.

        b.      In *FTC v. Connelly*, No. 06-cv-00701 (C.D. Cal. 2006), the court issued an *ex parte* TRO with an asset freeze against one defendant, but issued a noticed Order to Show Cause to the other two individual defendants, ordering them to show cause the following week as to why their assets should not be frozen. With notice that the FTC sought to freeze their assets, the three defendants withdrew at least $800,000 over the next two days, some of which was clearly subject to the asset freeze. One of the defendants whose assets were not immediately frozen withdrew approximately $450,000 from various accounts. By that defendant's own admission, he then transferred the money to friends, family, and his attorneys, "invested" $100,000 in a restaurant, and paid off a $49,000 car loan for the defendant whose assets were frozen. The third defendant transferred $350,000 to her attorney. Upon finding out that the defendants were rapidly withdrawing large sums of money, the court reversed its earlier decision and froze the assets of the remaining two individuals. Only a portion of the money was recovered.

        c.      In *FTC v. World Class Network, Inc.*, CV-97-162 AHS (C.D. Cal. 1997), after the court had issued an *ex parte* restraining order, two of the defendants withdrew $202,000 from the bank, spent it, and hid in assets after being served with the restraining order and asset freeze. The spouse of another defendant withdrew over $100,000 and left the state to open and deposit funds into an out-of-state account.

        d.      In *FTC v. O'Day*, No. 94-1108-CIV-ORL-22 (M.D. Fla. 1994), the court denied the FTC's request that an asset freeze be issued without notice to defendants and instead scheduled a noticed hearing on the relief sought. Within hours of receiving notice, an individual defendant withdrew approximately $200,000 from one of his bank accounts.

e.	In *FTC v. Renaissance Fine Arts, Ltd.*, No. 1:94CV0157 (N.D. Ohio 1994), the FTC filed a case without seeking an *ex parte* temporary restraining order with asset freeze. Shortly after the action began, the defendant liquidated his business and fled the country. The FTC then sought a temporary restraining order with an asset freeze, but it was too late. Although the FTC ultimately obtained a substantial monetary judgment, it could not be collected.

### *Ex Parte* TROs Can Effectively Preserve Assets

16.	In addition, as described in the following examples, also provided upon information and belief, temporary restraining orders with asset freezes, including *ex parte* temporary restraining orders, are often effective in preventing dissipation or concealment of assets and aiding in their recovery:

a.	In *FTC v. Goldman Schwartz Inc.*, No. 4:13-cv-00106 (S.D. Tex. 2013), the FTC sought and received an *ex parte* temporary restraining order with an asset freeze against numerous corporate and individual defendants, including the companies' owner. Within an hour of being served with the TRO, but before the asset freeze had been fully implemented, the owner withdrew approximately $268,000 from a frozen corporate account at BBVA and purchased a cashier's check payable to his non-defendant wife. Shortly thereafter, the owner liquidated approximately $160,000 in securities held in a personal TD Ameritrade account. The next day, the owner's wife withdrew another $18,500 from a non-defendant corporation's account that was covered by the asset freeze. Because the court had issued its asset freeze in advance of these actions, the FTC and a court-appointed monitor were able to recover all the money. TD Ameritrade received a faxed copy of the TRO and froze the owner's account before he could withdraw the proceeds from the sale of the securities, and the cashier's check and cash were voluntarily relinquished in response to a threatened contempt action.

b.	In *FTC v. Prime Legal Plans*, No. 12061872 (S.D. Fla. 2012), the FTC sought and received a temporary restraining order and asset freeze against the

defendants. Despite this, defendants, after learning of the FTC's action but before the asset freeze had been fully implemented, immediately directed the transfer of approximately $1.7 million from corporate bank accounts and into accounts held by a relative, a spouse, and a girlfriend. Because the court had issued an asset freeze, the bank was able to recover close to $1.5 million of that money, although $197,000 had been spent and was not recoverable.

      c.     In *FTC v. Productive Mktg.*, No. 00-065020-NM-BQR (C.D. Cal. 2000), the defendants' attempt to withdraw money from their bank was stymied by the temporary restraining order.

      d.     In *FTC v. Inetintl Com, Inc.*, CV-98-2140-CAS-CW (C.D. Cal. 1998), a defendant who had been served with the temporary restraining order nevertheless tried to withdraw money from his bank account but was unsuccessful because the temporary restraining order had been served on the bank.

      e.     In *FTC v. Equifin Int'l*, CV-97-4526 DT (C.D. Cal. 1997), due to an *ex parte* temporary restraining order and freeze, a receiver was able to recover money that an individual defendant withdrew after the order was served on the corporate defendants.

### Defendants in FTC Cases Often Attempt to Destroy Business Records

17.    Further, in numerous FTC cases, defendants who learn of an action by the FTC have destroyed or disposed of business records, as illustrated by the following examples, provided on information and belief:[15]

      a.     In *FTC v. Transcontinental Warranty, Inc.*, No. 09-2927 (N.D. Ill. 2009), the FTC moved for temporary restraining order but provided prior notice to the defendants rather than proceeding *ex parte*. The court granted the FTC's motion for a temporary restraining order freezing the defendants' assets and appointing a receiver.

---

[15] *See also supra* ¶ 15(a), *FTC v. Your Yellow Book*, CIV-14-786-D.

When the receiver and FTC arrived at the defendants' premises, they found hundreds of empty file folders with labels indicating that they had contained records of recent transactions. The defendants told the receiver that five computers, including that of the corporate defendant's CFO, had been "stolen" the night before and thus could not be examined.

    b. In *FTC v. Physicians Healthcare Dev., Inc.*, No. 02-02936 (C.D. Cal. 2002), defendants were given short notice of a temporary restraining order hearing. By the time of the hearing, defendants had removed all business records and computer equipment from the business premises. None of the records and computers were ever recovered.

    c. In *FTC v. Academic Guidance Servs.*, No. 92-3001 (AET) (D.N.J. 1992), defendants discovered that the FTC intended to file a case against them (and seek an *ex parte* temporary restraining order) the following week. The FTC later learned that after this discovery, the defendants promptly leased a document shredder and spent the weekend destroying evidence.

### Seal is Appropriate

18. A seal is also warranted in light of the efforts of various services to regularly monitor court filings. For example, provided on information and belief, in June 1999, the FTC's Western Region, Los Angeles Office, filed an *ex parte* motion for a TRO in *FTC v. Wazzu Corp.*, No. SACV-99-762-AHS (Anx) (C.D. Cal. 1999). When the FTC attorneys arrived at the defendants' business premises three days later to serve the TRO, the defendants said that they had already learned that the FTC had filed a case against them. The defendants' attorney stated that they subscribe to a monitoring service that checks all court filings on a daily basis to see whether any of the service's subscribers have been sued and that the monitoring service had seen information showing that the defendants had been sued by the FTC. This was confirmed by an FTC attorney

who spoke to the employee of the monitoring service who had discovered the FTC's lawsuit.

### Courts In This District Have Issued *Ex Parte* TROs in Numerous FTC Cases

19. In numerous other regulatory enforcement action brought to halt violations under Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. §45(a), courts in this district have issued similar *ex parte* temporary restraining orders. Cases in the District of Arizona include: *FTC v. Ambrosia Web Design LLC, et al.*, CV-12-2248-PHX-FJM (D. Ariz. 2012); *FTC v. N. Am. Mktg and Assoc., LLC, et al.*, CV-12-914-PHX-DGC (D. Ariz. 2012); *FTC v. Premier Nationwide Corp.*, CV-12-0009-PHX-GMS (D. Ariz. 2012); *FTC v. Government Careers, Inc.*, No. CV-09-721-TUC-DCB (D. Ariz. 2009); *FTC v. Helping Hands of Hope, Inc.*, No. CV-08-0909-PHX-JAT (D. Ariz. 2008); *FTC v. The Results Group, LLC*, No. CV-06-02843-PHX-JAT (D. Ariz. 2006); *FTC v. Wealth Sys., Inc.*, No. CV-05-0394-PHX-JAT (D. Ariz. 2005); *FTC v. Vector Direct Mktg., LLC*, No. CV-04-0095-PHX-SMM (D. Ariz. 2004); *FTC v. Corp. Mktg. Solutions, Inc.*, No. CV-02-1256-PHX-RCB (D. Ariz. 2002); *FTC v. Millennium Indus., Inc.*, CV-01-1932-PHX-MHM (D. Ariz. 2001); and *FTC v. Rjb Telcom, Inc.*, No. CV-00-2017-PHX-SRB (D. Ariz. 2000).

### Conclusion

20. Defendants have demonstrated through their deceptive conduct that they have little regard for the law. This action presents the possibility of a large monetary judgment. Advance notice would give Defendants the opportunity to destroy documents and take advantage of their international connections to transfer their assets beyond the reach of this Court. Doing so would cause immediate and irreparable injury, loss, or damage to the FTC's ability to prosecute this matter and to the Court's ability to award effective, final relief at trial or other disposition.

21. The FTC's request for temporary relief is intended to maintain status quo over assets and business documents relating to Defendants' law violations until a fair and impartial hearing may be held before the Court.

22. For all the above reasons, as contemplated by Federal Rule of Civil Procedure 65(b), there is good cause to believe that immediate and irreparable damage will result to consumers from the concealment, transfer, or dissipation of assets or the destruction of Defendants' records if Defendants receive advance notice of the FTC's Complaint and Application for TRO. In addition, it is in the interests of justice that this Court grant the FTC's *Ex Parte* Motion for an Order Temporarily Sealing File and Memorandum in Support thereof.

23. The FTC has not made a previous application for similar relief in this matter.

I declare and certify under penalty of perjury that the foregoing is true and correct.

Executed at Dallas, Texas, on August 15, 2015.

_____
Angeleque P. Linville