Quarles & Brady LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391
TELEPHONE 602.229.5200

Brian R. Booker (#015637)
brian.booker@quarles.com
John A. Harris (#014459)
john.harris@quarles.com
Kevin D. Quigley (015972)
kevin.quigley@quarles.com
Edward A. Salanga (#20654)
edward.salanga@quarles.com

*Attorneys for Defendants Vemma Nutrition Company and Vemma International Holdings, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | NO. CV-15-01578-PHX-JJT |
| Plaintiff, | **RESPONSE AND OBJECTION TO MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A RECEIVER, AND OTHER EQUITABLE RELIEF, AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| vs. | |
| Vemma Nutrition Company, *et al.*; | |
| Defendants, | |

Vemma Nutrition Company and Vemma International Holdings, Inc. (collectively, "**Vemma**") submit this Response and Objection to the motion for a preliminary injunction, asset freeze, appointment of a receiver, and other relief (the "**Motion**") filed by the Federal Trade Commission (the "**FTC**") in the above-caption action (the "**FTC Action**").

QB\36408757.7

## I.      INTRODUCTION

At an *ex parte* and under seal hearing conducted on August 21, 2015 (the "**Ex Parte Hearing**"), with no notice or opportunity to respond being afforded to any of the defendants, the FTC presented to the Court in support of its request for temporary and permanent injunctive relief the declaration testimony of multiple affirmative witnesses and more than 1400 pages of exhibits.  This Court was concerned regarding the extraordinary relief sought at the Ex Parte Hearing, and cautioned the FTC that all Vemma's ability to defend itself should be preserved and not usurped by a receiver or otherwise.  The FTC assured the Court at the Ex Parte Hearing that Vemma's financial data would support its position, and that the request for a temporary restraining order and immediate appointment of a temporary receiver was designed to maintain the *status quo*.

Notwithstanding the FTC's representations and the Court's concern regarding Vemma's ability to defend itself, the temporary receiver immediately took drastic action within hours of his taking control of Vemma.  The temporary receiver terminated all of Vemma's business operations and laid off the more than 100 Vemma employees.  To this day, the temporary receiver has failed to pay any of Vemma's creditors, and he has provided no explanation to the thousands of Vemma affiliates and customers affected by his actions.  The temporary receiver has greatly impaired the defendants' ability to mount a defense to the FTC's allegations, which the FTC developed as part of a year-long investigation.  The harm the temporary receiver has done and the damage he continues to inflict on Vemma are incalculable.  Vemma, put simply, was ambushed.

Vemma has not had over a year to develop its defenses against the FTC – it has had all of two weeks.  Notwithstanding the unlevel playing field the FTC provided for itself in this action, Vemma is prepared to submit evidence to demonstrate that the FTC's arguments and allegations for a preliminary injunction are flawed, misleading, incomplete, and wrong.  As will be demonstrated through financial data, depositions, and declaration

testimony tested by cross examination at the preliminary injunction hearing (the "**PI Hearing**"):[1]

- The overwhelming majority of Vemma's revenue is derived from the sale of an array of health, energy, lifestyle, and fitness products through a substantial and longstanding business network with global operations, upon which thousands of employees, creditors, affiliates, and customers rely.

- The crux of the FTC's allegation that Vemma operates an illegal pyramid scheme – i.e., that it drives recruitment over product sales – is contradicted by the company's actual financial data, which demonstrates that the majority of sales relate to consumption by both Affiliates and customers – not recruitment.

- The FTC was wrong when it told this Court in support of its request for a TRO that it would find "the vast majority of the purchases, or are least a solid majority of the purchases, [are] what [the FTC] consider[s] cost of the business participation, which would be the $600 Affiliate Pack, the $150 a month auto-delivery" and that "most of the sales volume is going to be traceable to that activity." (Ex Parte Hearing Transcript ("**Hearing Tr.**"), at 5: 18-25; 6:1.] In fact, the vast majority of Vemma's revenue is not derived from the sale of "Affiliate Packs" or auto-ship delivery to Affiliates, as asserted by the FTC.

- The FTC's allegation that Vemma provides misleading or deceptive information in connection with its operations is incorrect.  For example, the income disclosures that the FTC and the temporary receiver claim are afoul of applicable law are reflective of actual results, not misleading, and consistent with Ninth Circuit precedent the FTC's own guidance.

- Despite the FTC's bald and unsupported allegations in the Motion, the temporary receiver recommended by the FTC acknowledges in his report that Vemma's policies to monitor Affiliate misconduct exist, they are reasonable, and Vemma's compliance department is well-qualified to oversee the compliance aspects of the company.  The evidence will show

---

[1]    Pursuant to order of the Court, the FTC is required to produce documents to the defendants, and depositions held of the temporary receiver and the FTC's investigator, after the filing of this Memorandum. Vemma reserves fully their right to supplement the evidence and arguments presented by the Vemma resulting from this discovery.

that Vemma's compliance department monitors Affiliates to ensure compliance with the company's terms and conditions.

- Without an understanding of Vemma's financials and operations, the temporary receiver ceased the entire business, including global operations, and laid off over 100 employees, causing significant harm to Vemma and its creditor constituencies, Affiliates and customers, and international operations. The temporary receiver summarily ignored Vemma's management and suggestions to continue business operations, even on a limited basis. The temporary receiver's report makes it abundantly clear that the temporary receiver has not explosred, and has no intention of exploring or implementing, any operational changes for Vemma, salvaging the company as a going concern, or even preserving value for its shareholders. Rather, his interest is in summarily closing down Vemma in its entirety (which he has done), and in trying to support the FTC in its case.

- There is no basis for the Court to keep the temporary receiver in control over Vemma's assets under these circumstances. The evidence demonstrates that Vemma can operate legally in a transparent fashion to salvage value for all constituencies while the parties prepare for a trial on the merits in the FTC Action.

- In all events, the Court should lift the restriction requested by the FTC that would prohibit the defendants from filing a petition(s) for relief under the United States Bankruptcy Code. The right to file bankruptcy is a basic right under federal law. The damage to Vemma caused by the action of the FTC and the temporary receiver may already be so great that Vemma will need to restructure its affairs. In addition, bankruptcy provides the only federal forum designed to assess and restructure a business under judicial oversight and, pursuant to a comprehensive statutory structure, address the interests of *all* constituencies affected by the future of Vemma.

Accordingly, the FTC has not met its burden that it has a likelihood of success on the merits in the FTC Action, nor does it meet its burden that assets should remain frozen, and that a receiver should remain in control of Vemma's assets and business operations.

This Response and Objection is supported by the Declarations of Dr. Erme Carr ("**Dr. Carr Decl.**"), Allison Tengan ("**Tengan Decl**"), Brad Wayment ("**Wayment Decl.**"), and the exhibits cited therein; and the MCA Report, all filed contemporaneously

herewith;  the evidence to be presented at the PI Hearing, the entire record before the Court, and by the following points and authorities.

## II.    FACTS

### A.    Vemma's Business Operations In The United States And Abroad.

1.    The Vemma Nutrition Company ("**Vemma Nutrition**") is an Arizona Corporation formed in 2004 for the purpose of developing, marketing, and selling a wide array of health, energy, lifestyle, and fitness products.  Vemma International Holdings, Inc. ("**Vemma Holdings**"), is an Arizona corporation and Vemma Nutrition's parent company. [*See* Wayment Decl. ¶¶ 6-12.]

2.    Vemma's business is the marketing and sale of the following four lines of health, energy, lifestyle, and fitness products (the "**Vemma Products**"):

- **Vemma**.  Vemma is a clinically-studied liquid vitamin drink. Vemma Co Q10, Vemma EPA 1000 Omega-3, and Vemma Coral Calcium, are Vemma's capsule-form vitamin line. Vemma Renew is a product that moisturizes and renews skin, nails, and hair.

- **Verve**, which includes Verve, Verve Bold, Verve Remix, Verve Zero Sugar, Verve Partea, and Verve Energy Shot. These are energy and caffeinated drinks and supplements designed to revitalize energy levels and provide antioxidants and other nutrients.

- **Bod-e**, which includes Bod-e Shake and Bod-e Burn, is a vitamin and mineral program designed to accompany a healthy diet.  Bod-e Pro Build is a meal replacement shake designed to nourish the body and maintain a healthy weight. Bod-e Cleanse and Bod-e Rest are liquid blends designed to cleanse and restore the body.

- **Vemma Next**, which is a liquid blend of vitamins, minerals, and fatty acids designed for children.  [*Id.* ¶ 15.]

3.      Vemma has many retail locations across the United States.  Vemma Holdings' other subsidiaries and affiliates conduct global operations in Canada, Mexico, Asia, Australia, South Africa, Europe, Columbia, and New Zealand.  [*Id.* ¶ 8-14.]

4.      Vemma's corporate headquarters are located at a state-of-the-art facility in Tempe, Arizona.   Prior to their termination, over 100 full- and part-time employees worked for Vemma.   [*Id.* ¶¶ 6, 18-19.]

5.      Vemma's global revenues are in the hundreds of millions of dollars. [*Id..* at ¶ 17; MCA Report, at p. 5.]

6.      Virtually all of Vemma's revenues derive from the sale of its products described above.  [*Id.* ¶ 16.]

7.      At the time the temporary receiver took control of Vemma's assets, Vemma had nearly 140 creditors holding over $3,800,000 in claims.  The vast majority of these creditors are third party vendors with no relationship to Vemma.  [Wayment Decl. ¶ 21.]

**B.      Vemma Affiliates.**

8.      Vemma is a type of multi-level marketing (MLM) company that markets and sells its products through a network of distributors that are independent contractors ("**Affiliates**"), and to end users that consume the product.

9.      Affiliates may sell their product purchases from Vemma to end users, or they may consume their own product as an end user.   [Wayment Decl. ¶ 22; MCA Report, at p. 7.]

10.      It is free to sign up to become an Affiliate.   There are no yearly or monthly fees, and there are no minimum purchases of Vemma product required to be an Affiliate.  [Wayment Decl. ¶¶ 23-24; MCA Report, at p. 8.]

11.      In addition to their own sales revenues, Affiliates may recruit additional Affiliates in downlines who purchase product directly from Vemma. Active

Affiliates may earn bonuses during a 4-week cycle on account of the purchases made by their Affiliates in their downlines.  In order to qualify for a bonus, an Affiliate must earn 120 points of "qualifying volume" or "QV."  120QV can be earned in a cycle by an Affiliate's purchase of various combinations of Vemma products during that cycle.  The minimum purchase amount required to generate 120QV is approximately $135.00.  [Carr. Decl. ¶12, n.3.]

12.    Affiliates may choose to purchase a pack of Vemma products, marketing materials, and product information at the cost of $600.00 (an "**Affiliate Pack**"), which would qualify them for bonuses set forth above.  Affiliates may also sign-up for an auto-shipment of products in an amount that can qualify them for the bonuses described above.

13.    Contrary to the FTC's allegation that Vemma's business is designed solely to sell the business opportunity to Affiliates through downline bonuses, Vemma employs extensive marketing and training programs to assist Affiliates with the sale of Vemma's product.  [Wayment Decl. ¶¶ 22-48; Tengan Decl. ¶¶ 17-20.]

14.    Furthermore, the financial data demonstrates that Affiliates are not in it for the business opportunity as asserted by the FTC.  The average monthly auto-ship by an Affiliate is less than 120 QV.  As such, the only reasonable conclusion is that many Affiliates are not purchasing Vemma product for the "business opportunity" as represented by the FTC; rather, Affiliates are purchasing Vemma product to consume or resell themselves.  [Carr Decl. ¶¶ 46-47.]

15.    The sales data also illustrates that Vemma's portion of revenue attributable to the sale of Affiliate Packs and Affiliate auto-ship purchases is just 47% in 2014, down to 41% in 2015 – not even a majority of Vemma's sales, let alone the "vast majority" the FTC told this Court it would come forward with after a receiver was appointed. [Hearing Tr., at 5:18-25, 6:1]; [*see also* Carr Decl. ¶ 42, n.17; MCA Report, §

VII(C), p. 9-11.]

16.     Since the time he took control of Vemma, the temporary receiver has gathered volumes of data, including, Affiliate figures, Affiliate Pack sales figures, auto-ship sales figures, and related sales and financial information.  The Report Of Temporary Receiver's Activities August 24, 2015 Through September 4, 2015 [Docket No. 50-1] (the "**Temporary Receiver's Report**"), however, completely ignores Affiliate Pack sales and auto-ship sales figures, even though those figures would be critical to the FTC's argument that Vemma operated a pyramid scheme.  The Temporary Receiver's Report does not even mention those items.  [Wayment Decl. ¶¶ 69-70.]

## C.     Vemma's Compliance Department, Its Policies, And Its Enforcement Of Policies.

17.     The temporary receiver admits that Vemma has detailed standard operating procedures for the compliance department.  He further admits that if those procedures are followed, the procedures would result in effective monitoring of the activities of the Affiliates to identify misconduct and take appropriate disciplinary action.  The temporary receiver also states that the Affiliate Application (Terms and Conditions) are well written.  [Temporary Receiver's Report, p. 16.]

18.     Up until the time the temporary receiver terminated them, Vemma also employed no fewer than four full-time employees dedicated to the development and monitoring of Vemma's internal and external compliance policies, and the enforcement thereof.   The temporary receiver acknowledges the high level of experience and competency of the employees in the compliance department.  [*Id.*; *see also* Tengan Decl. ¶ 5.]

19.     Vemma had reasonable compliance policies and enforcement procedures to identify misconduct of the Affiliates and take action.  For example, in January 2015, Vemma executed an agreement with Momentum Factor to use a web-based,

QB\36408757.7

internet-search service called "Field Watch."  Under the agreement for Field Watch, Momentum Factor would scour the internet using Vemma-related search terms and gather "hits" of websites that contained the terms.  Momentum Factor would generate a list of potential violating websites by applying Vemma's policies and directions from Vemma. These lists would be generated on a daily basis and provided to a compliance department employee hired to specifically monitor the internet for policy violations and enforce same. Prior to the Field Watch service, Vemma manually employed processes and procedures to search the internet for Affiliate misconduct and policy violations.   [Tengan Decl. ¶¶ 7-15.]

20.    Vemma also has implemented policies to prevent "inventory loading." One example of such anti-inventory loading policy is Vemma's policy that at least 70% of an Affiliate's purchased product must be consumed or sold to an end user.   The compliance department would enforce this policy by contacting randomly-selected Affiliates each month to obtain a certification that the Affiliates were complying with the policy.  Almost every Affiliate certified that he/she either consumed or retailed at least 70% of the product they he/she purchased.  After an affirmative certification, Vemma would send by electronic mail or regular mail a letter to the Affiliate acknowledging the certification.  [*Id.* ¶¶ 21-27.]

21.    On the occasion that an Affiliate would not so certify, then such Affiliate would be reminded that product purchases (including auto-ship) would be placed on hold (if applicable).  Furthermore, if the Affiliate would have a concern regarding the product, the Affiliate would be reminded of the general return and buyback policies and directed to the same.  In this regard, Vemma would be flexible with the Affiliate in accomplishing a return or buyback of product, even if the Affiliate did not qualify under the company's policies for a return or buyback.  [*Id.* ¶¶ 28-29.]

22.     Vemma also internally monitored its Affiliates' purchases of Vemma product.  If a particular Affiliate ordered an amount of Vemma product that exceeded $400, the sales system would automatically place the order on hold, and such Affiliate would be directly contacted to determine if he/she was loading inventory.  [*Id.* ¶ 30.]

23.     Vemma had liberal return and buy back policies.  [Wayment Decl. ¶¶ 53-57.]

24.     The compliance department at Vemma further held multiple training sessions at conferences, and distributed compliance and training videos to Affiliates by electronic mail through Vemma's "Insider" weekly electronic publication.  Additionally, Vemma posts links to compliance-training videos on, among other sites, www.vemma.com, and www.vemmanews.com, which are accessible to any person. Affiliates may further access videos and compliance materials through the Vemma Back Office, which is accessible through an Affiliate password. [Tengan Decl. ¶¶ 16-20.]

**D.     The FTC Commences The FTC Action In Secret And The Temporary Receiver Immediately Ceases Operations.**

25.     On the same day that the temporary receiver first appeared, he summarily terminated Vemma's business operations and laid off employees.  [Wayment Decl. ¶¶ 82-83.]

26.     The next morning on August 25, 2015, and despite repeated requests from members of executive management to start taking orders for the purchase of product, the temporary receiver determined not to restart operations, and he began to repatriate all cash from international markets to the United States. Members of executive management further requested that sales continue in the international markets and explained that the actions the FTC believed to be objectionable did not occur in the international markets. The temporary receiver ignored executive management's appeals to continue both the U.S. and international sales.  [*Id.* ¶¶ 84-85.]

QB\36408757.7

27.     There was no meaningful review or analysis of financial data prior to the temporary receiver taking such drastic and, at least in some respects, irreversible action.  The temporary receiver refused to consider management's recommendation to continue business operations, even on a limited basis to preserve the Affiliate network. The Temporary Receiver's Report contains no discussion or analysis of management's recommendations, nor why such recommendations were inappropriate.  [*Id.*; MCA Report, at § VII(F), p. 15-23.]

28.     Communications from the temporary receiver to affected constituencies, including Affiliates and consumers, have been vague and non-descriptive. On information and belief, the temporary receiver has not had any meaningful communications with any of Vemma's creditor or employee constituencies about when and if they will be paid.[2]  [*Id.* ¶ 100.]

29.     Substantial amounts of on-hand inventory and raw material owned by Vemma[3] and used to manufacture Vemma products have or will go to waste due to the temporary receiver's outright refusal to resurrect any operations.  [*Id.* ¶¶ 88-99.]

**E.     The Temporary Receiver's Report Is Incorrect In Several Respects.**

30.     Significant portions of the Temporary Receiver Report are incorrect, based on faulty analysis, and are misleading.  [MCA Report, § VII(F), p. 15-23.]

---

[2]     The temporary receiver has no meaningful plan moving forward or any intention to restart business operations.  The only next step the temporary receiver has identified he may take in the future is "evaluate what claims, if any, may exist against highly compensated Affiliates."  [Temporary Receiver Report, p. 21.]

[3]     Raw material used to manufacture Vemma products is owned and held by a non-Vemma packaging and distribution company.

QB\36408757.7

**F.      Vemma Can Operate Legally And Profitably On An Interim Basis Pending Determination Of The FTC's Action On The Merits.**

31.      Prior to the initiation of the FTC Action, the FTC never raised any concern with Vemma regarding its business practices described above.  The FTC never made any inquiry of Vemma regarding its practices, and it never asked Vemma to describe or provide any information regarding its business practices.  As described above, Vemma has consistently and continuously worked to maintain proper business practices, to address and resolve issues as they arise, and to operate in an appropriate and lawful manner at all times.  If the FTC had at any time apprised Vemma of concerns regarding its business practices, Vemma would have immediately worked to address the FTC's concerns and, if necessary, modified its practices to resolve any legitimate issues raised by the FTC.  The FTC, and the temporary receiver since his appointment, chose to avoid any such dialogue.  [Wayment Decl. ¶ 65.]

32.      Since receiving notice of the TRO and since the time the temporary receiver took control over its assets, Vemma's counsel and its unpaid staff have cooperated completely with the FTC and the temporary receiver, and each of their staff and counsel.  As previously mentioned, Vemma's cooperation with the FTC and the temporary receiver have made it difficult to mount a defense due to the tight time frame, the temporary receiver's information requests, and the limited access to data caused by the temporary receiver.  [*Id.* ¶¶ 68-70.]

33.      The temporary receiver's arbitrary actions are resulting in the destruction of Vemma's substantial business value; the non-payment of Vemma's many third party creditors and employees; and, if allowed to continue, the loss of any ability for Vemma to resume operations and continue as a going business concern.  [*Id.* ¶ 104.]

34.      Vemma believes there is no merit to the FTC's allegations, and that the temporary receiver should be removed and the asset freeze should be lifted without

condition.  Vemma, however, is willing to operate in a more limited and modified fashion during the pendency of the FTC Action that provides complete transparency of its operations and eliminates any concern that the interim operations will involve any improper business activity or any risk of loss or destruction of books, records, or other assets.  [*Id.* ¶ 105.]

35.    As described below, in this manner the true *status quo* would be maintained rather than the summary liquidation of what has been a viable business operation for more than a decade.  The modified interim business operations of Vemma will include each of the following elements:

- Vemma will preserve all books and records as they existed when the FTC Action was commenced, and will not destroy, alter, or remove any of their books and records without prior notice to the FTC and the Court.  If the FTC objects to any proposed disposition of books and records, Vemma will not proceed absent approval from the Court.

- Vemma will provide the FTC and its representatives (including the Receiver if so designated) with continuing access to the books and records of Vemma, and they will continue to make knowledgeable representatives available to answer questions and inquiries from such representatives.

- Vemma will suspend sales of Affiliate Packs and bonuses on same pending further order of the Court.

- Vemma will suspend the Two and Go program pending further order of the Court.

- Vemma will not publish or disseminate new marketing or sales materials without prior delivery to the FTC and a five-day period for the FTC to review the materials.  If the FTC objects to any such materials, Vemma will not use such materials absent approval of the Court.

QB\36408757.7

- Vemma will operate with a smaller management and employee team necessary for the limited interim operations.

- Vemma and BK Boreyko will work together to present a proposal limiting Mr. Boreyko's involvement with Vemma going forward during the interim period. Defendant Tom Alkazin has never been an employee, officer, director or manager of Vemma and will not be involved in the interim operations of Vemma in any capacity whatsoever.

- Vemma will not transfer or dispose of any material assets of the entities (other than ordinary course sales and related transactions) without prior notice to the Court and the FTC. If the FTC objects to any proposed asset disposition, Vemma will not proceed with same absent prior approval from the Court.

- Vemma will file regular reports with the Court and the FTC, describing in detail the business operations, including all sales, and all cash inflows and outflows.

- Vemma's independent financial advisor, MCA Financial, will prepare and file a report within a reasonable period of time analyzing Vemma's business operations and its ability to maintain stable and profitable operations under the interim modified terms described above.

- The temporary receiver is removed from control over Vemma's assets and operations, and the freeze of Vemma's assets is lifted. However, if Vemma fails at any time to satisfy each of the above listed elements, it will be subject to re-imposition of the temporary receiver and the asset freeze.

- If deemed appropriate by the Court, Vemma would agree to an independent third-party, in addition to MCA, to monitor the business operations and compliance with all Orders put in place by the Court during the pendency of the FTC Action.

[*Id.* ¶ 106.]

## III.   LEGAL ARGUMENT

### A.   The Legal Standard.

"A preliminary injunction is an extraordinary and drastic remedy, one that should

QB\36408757.7

1   not be granted unless the movant, **by a clear showing**, carries the burden of persuasion."

2   *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citing *Mazurek v. Armstrong*, 520

3   U.S. 968, 972 (1997) (per curiam) (emphasis added); *F.T.C. v. Millennium Telecard, Inc.*,

4   No. CIV.A. 11-2479 JLL, 2011 WL 2745963, at *2 (D.N.J. July 12, 2011) ("A

5   preliminary injunction is a drastic and extraordinary remedy that is not to be routinely

6   granted.")  The government must make "a proper showing that, weighing the equities and

7   considering the Commission's likelihood of ultimate success, such action would be in the

8   public interest."  *FTC. v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999).

9       When a district court balances the hardships of the public interest against a private

10  interest, the public interest generally receives greater weight.  *Id.*  However, courts may

11  not "drop private equities from the calculus" in determining whether to reverse or modify

12  a temporary restraining order, *F.T.C. v. World Travel Vacation Brokers, Inc.*, 861 F.2d

13  1020, 1030 (7th Cir. 1988), but should carefully weigh them to determine whether

14  "restraints currently in place should be continued or modified in whole or in part."

15  *Millenium Telecard*, No. CIV.A. 11-2479 JLL, 2011 WL 2745963, at *10.  *See also FTC*

16  *v. Nat'l Tea Co.,* 603 F.2d 694, 697 n. 4 (8th Cir. 1979) ("[W]e do not think that it was the

17  intention of the statute's drafters to totally shield from judicial view the private equities

18  which may merit inclusion in the courts' equitable overview.")

19      Moreover, under Section 13(b), the FTC is entitled to injunctive relief only for

20  continuing violations or violations that are likely to recur – "the statute does not mention

21  past violations."  *FTC v. Evans Products Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985); *F.T.C.*

22  *v. Merch. Servs. Direct, LLC*, 2013-2 Trade Cases P 78490, 2013 WL 4094394, at *1

23  (E.D. Wash. Aug. 13, 2013) ("In deciding whether the FTC has made a 'proper showing'

24  of entitlement to injunctive relief, a court must independently assess whether violations

25  are imminent.") (citations omitted).

26      **B.     The FTC Has Failed To Meet Its Burden Of Proving That Injunctive**

**Relief Is Warranted Against Vemma.**

The FTC has acknowledged to the Court that it has no actual data to support its claims. Rather, based primarily on selective references to videos and similar communications, it asks the Court to assume that Vemma's financial data will support its claims. However, the FTC has acknowledged (as it must) that its claims have no merit if the data does not come out as it assumes, and the ***FTC has acknowledged what the data must show***. At the Ex Parte Hearing, the FTC told this Court:

> We believe that, ultimately, when we obtain the company's records, we're going to determine that ***the vast majority of the purchases, or at least a solid majority of the purchases, were what we consider cost of the business participation, which would be the $600 Affiliate Pack, the $150 a month auto-delivery*** which the company, in its own statements, has made very clear it considers a cost of doing business in this business model. We believe that most of the sales volume is going to be traceable to that activity.

[Hearing Tr., at 5] (emphasis added). The FTC got its wish – the TRO was entered, and the temporary receiver immediately took over the company. But even after having another 11 days to gather evidence from the company[4], with the full assistance of Vemma's now former employees, the FTC's promised showing has not materialized.

The FTC did not and cannot produce this evidence because it does not exist. The financial records that the FTC told the Court would show that "the vast majority" of purchases were Affiliate Packs and auto-ship purchases in the amount of $150 month actually show just the opposite. In 2015, less than 8% of the company's net revenues were derived from Affiliate Pack sales. [Carr Decl. ¶ 36.] And the average monthly auto-ship purchases by Affiliates is $121.00 – far less than the $150 per month the FTC promised it would show and, more importantly, less than the 120 QV necessary to qualify

---

[4]   By stipulation, the Parties agreed to continue the preliminary injunction hearing from September 3 to September 15, and the Court extended the FTC's deadline to supplement its evidence from August 28 to September 8.

QB\36408757.7

for bonuses under the Compensation Plan.  [*Id.* ¶¶ 40, 42.]  The financial records show that the business is not a pyramid scheme in structure or in operation.  Rather, it is a legitimate MLM business.

Now that it is no longer able to proceed *ex parte*, the FTC cannot show a likelihood of success on the merits.  Accordingly, a balancing of the equities is not necessary.  *See F.T.C. v. Sterling Precious Metals, LLC*, 894 F. Supp. 2d 1378, 1383 (S.D. Fla. 2012) (denying FTC's motion for temporary restraining order without addressing the "equities" when FTC failed to show a likelihood of success on the merits).  But even considering the equities based on the facts now before the Court – and not the unfounded opinions that the FTC relied upon before – the balance would tip heavily in favor of Vemma.  The TRO and proposed preliminary injunction are nothing short of a death sentence for Vemma's business, and one which was obtained based on incorrect assumptions and unfulfilled promises.  At a minimum, if the Court grants any preliminary injunctive relief, it should be narrowly tailored to address and preclude specific practices which the FTC can show will likely be determined to be improper.  There is no basis under any circumstances to shut down the entire business operation, and to leave it in the hands of a receiver who has no intention or desire to continue any business operations.  In this case, that certainly does not include enjoining Vemma from continuing to run its legitimate MLM business.

**1.    The FTC Has Not Demonstrated A Likelihood Of Success On The Merits On Its Claim That Vemma Is A Pyramid Scheme.**

"Pyramid schemes are said to be inherently fraudulent because they must eventually collapse."  *Webster v. Omnitrition Int'l, Inc.* ("*Omnitrition*"), 79 F.3d 776, 781 (9th Cir. 1996).  The MLM business model, however, is perfectly legitimate, even though MLMs share some elements also found in pyramid schemes.  *F.T.C. v. BurnLounge, Inc.* ("*BurnLounge*"), 753 F.3d 878, 883 (9th Cir. 2014) ("[n]ot all MLM businesses are illegal pyramid schemes"); *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 480 (6th Cir.

1999) ("Courts and legislatures recognize a distinction between legitimate programs (known as multi-level marketing systems) and illegal schemes.")

In an MLM company that is operating as a pyramid scheme, rewards are paid to distributors "primarily for recruitment" rather than for the sale of products to "ultimate users". *BurnLounge*, 753 F.3d at 889. The Ninth Circuit employs the FTC's pyramid scheme test as set forth in *In re Koscot Interplanetary, Inc.* ("*Koscot*"), 86 F.T.C. 1106 (1975). The most recent application of the *Koscot* test in this circuit was in *BurnLounge*, where the Ninth Circuit stated the *Koscot* test as follows:

> a pyramid scheme is characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.

*Id.* (quoting *Omnitrition*, 79 F.3d at 781).

The first part of the *Koscot* test is satisfied by either a required purchase to become a distributor, *see BurnLounge*, 753 F.3d at 833, or "where the participant is **required** to purchase '**non returnable**' inventory in order to receive the full benefits of the program", *see Omnitrition*, 79 F.3d at 782 (emphasis added).

The second part of the *Koscot* test is "the *sine qua non* of a pyramid scheme" *Omnitrition*, 79 F.3d at 781, and is driven, in large part, out of a concern over "inventory loading" – a practice that "requires a person seeking to become a distributor to pay a large sum of money, either as an entry fee . . . or for the purchase of a large amount of nonrefundable inventory." *Whole Living, Inc. v. Tolman*, 344 F. Supp. 2d 739, 744 (2004) (quoting *Amway*, 93 F.T.C. 618 (1979)). *See also*, *Amway*, 93 F.T.C. at 715-16 (where the FTC found Amway was not a pyramid scheme **because its policies prevented inventory loading and encouraged retail sales**) (emphasis added). In regards to this element of the pyramid scheme analysis, the FTC has provided the following guidance:

> The critical question for the FTC is whether the revenues that primarily support the commissions paid to all participants are generated from purchases of goods and serves that are not simply incidental to the purchase of the right to participate in a money-making venture.

*BurnLounge*, 753 F.3d at 887 (quoting FTC Staff Advisory Opinion – Pyramid Scheme Analysis, dated January 14, 2004 ("FTC Opinion")).[5]

In evaluating whether the rewards paid to distributors come primarily from recruiting, rather than the sale of products to ultimate users, the courts look beyond a company's policies and procedures to how the company operates in practice. *BurnLounge*, 753 F.3d at 883 ("To determine whether a MLM business is a pyramid, a court must look at how the MLM business operates in practice"); *see also Omnitrition*, 79 F.3d at 783–84; *Gold*, 177 F.3d at 479–82; *Amway*, 93 F.T.C. at 716.  Therefore, it is not enough to merely point to policies against inventory loading; the company must show that the policies are effective and enforced.  *See Omnitrition*, 79 F.3d at 782-84.  The FTC, however, also has a burden:  it must show that in practice the company is actually rewarding distributors primarily for recruiting rather than for the sale of product to ultimate users.

Importantly, in assessing whether the MLM is actually rewarding distributors primarily for recruiting rather than for the sale of product to ultimate users, the FTC must accept the fact that sales made to distributors can be sales to ultimate users.  In *BurnLounge*, the Ninth Circuit rejected the very position the FTC urged at the Ex Parte Hearing – that sales to distributors (i.e., "internal consumption") should not count as sales of products to ultimate users.  *BurnLounge*, 753 F.3d at 887.  Rejecting the FTC's assertion of this same argument in *BurnLounge*, the Ninth Circuit found that

---

[5]   The FTC Opinion is posted on the FTC's website at https://www.ftc.gov/policy/advisory-opinions/staff-advisory-opinion-pyramid-scheme-analysis.

"BurnLounge is correct that when participants bought packages in part for internal consumption . . . **the participants were the 'ultimate users' of the merchandise and that this internal sale alone does not make BurnLounge a pyramid scheme**." *Id.* (emphasis added).  In fact, the FTC has recognized in its own guidance that "the amount of internal consumption in any multi-level compensation business **does not determine whether or not the FTC will consider the plan a pyramid scheme**." *Id.*  (emphasis added) (quoting FTC Opinion).  In other words, whether a product is purchased by someone who is also participating in the compensation plan is not determinative; if the distributor who buys the product also consumes it as an "ultimate user" then any commissions paid on those sales are not rewards paid for recruiting under *Koscot*.

With these points in mind, the Court must evaluate whether the FTC has met its heavy burden of showing that it will likely succeed on its claim that Vemma is a pyramid scheme, rather than a legitimate MLM business.

### a.   The FTC Has Not Shown That Vemma Satisfies The First Prong Of The *Koscot* Test – The Purchase Requirement.

The FTC has not and cannot come forward with evidence clearly showing that the first part of the *Koscot* test is satisfied by either (1) a required payment to become a Vemma Affiliate or (2) a requirement to purchase non-returnable inventory.   *See BurnLounge*, 753 F.3d at 833; *Omnitrition*, 79 F.3d at 782.

The FTC has already conceded – as it must – that Vemma does not have **any** sign up fee to become an Affiliate.  [Hearing Tr., at 10; Wayment Decl. ¶ 23   (Vemma Affiliate Agreement Terms and Conditions, § 5 ("Do I need to buy Vemma products to become an Affiliate?   No, you do not need to purchase products to become an Affiliate")).]   And while two bonuses require the purchase of an Affiliate Pack (the "Frenzy" and "Double Frenzy" bonuses), the FTC has not presented any evidence that these bonuses represent a majority (or even a significant percentage) of the commissions

QB\36408757.7

paid to Affiliates.  In fact, these commissions amount to just 2.6% of all U.S. commissions for 2013 through August 2015 [Carr Decl. ¶ 40, n.5.]  Instead, the FTC is attempting to satisfy the first part of the *Koscot* test based on a theory that, under the Vemma compensation plan, a distributor is required to purchase non-returnable inventory. [Hearing Tr., at 11.]  But this argument is simply not supported by any evidence.

When advancing this argument at the Ex Parte Hearing, the FTC relied solely on its own assumptions of what Vemma's financial data would show when it told the Court it would deliver evidence that "the vast majority, or at least a solid majority of the purchases" were "cost[s] of the business participation, which would be the $600 Affiliate Pack [and] the $150 a month auto-delivery." [Hearing Tr., at 5.]  In other words, the FTC's argument was *not* based on actual data, but what the FTC expected the data to look like – *i.e.*, high volume of Affiliate Pack purchases and auto-ship sales.

Picking up on the FTC's lack of actual data, the Court correctly pointed out to the FTC that the statistics ultimately could go either way:

> I didn't see anything among your expert's papers or any of the other statistics developed that showed what percentage of folks were able to achieve significant income from this program who didn't go the route of making the purchase up front of the starter pack, the Affiliate Pack, and then the auto-ship and such.

[*Id.* at 10.]  The FTC responded by admitting, again, that its arguments were not based on "internal sales records from the company at this point."  [*Id.*]   Instead, the FTC was relying solely on statements by Mr. Boreyko and certain independent Affiliates encouraging people to buy an Affiliate Pack and then go on auto-ship at an amount of $150 per month.   [*Id.* at 11-12.]  Mere encouragement, however, is not enough to satisfy the first part of the *Koscot* test concerning a required purchase.  *See Omnitrition*, 79 F.3d at 782 ("The 'payment of money' element of a pyramid scheme can be met where the participant is **required** to purchase '**non returnable**' inventory in order to receive the full

QB\36408757.7

benefits of the program") (emphasis added).  Here, it is not disputable that there is no **requirement** to buy **any** product, and any product that is purchased is covered by a one-year buyback policy.  [*See* Wayment Decl. ¶ 23  (Terms and Conditions,  at §§ 5, 38.]

Moreover, the FTC's position is not supported by the actual data.  Vemma's 2013, 2014, and 2015 sales data refutes any notion that Vemma has a functional purchase requirement.  Affiliate Pack purchases accounted for only 15.8% of total sales in 2014, and less than **8%** of total sales in 2015.  [Carr Decl. ¶ 36.]  In addition, the average monthly  Affiliate auto-ship purchase was approximately $118.29 / 99.22 QV (2014) and $116.70 / 94.23 QV (2015) – in both cases substantially **less** than the minimum purchase needed to be qualified for commissions under the Compensation Plan.  [*Id.* ¶ 42, n. 17.]  Even when you add the Affiliate Pack purchases and the auto-ship purchases by Affiliates, the totals are only **47% of total sales in 2014**, and **41% total sales in 2015**.  [*Id.*]  Ignoring the reality that these sales include sales for internal consumption and retail sales, the FTC has not shown – and cannot show –  that the "vast majority" of Vemma's sales volume comes from Affiliate Pack and auto-ship sales to Affiliates.  [Hearing Tr., at 5-6.]

The "wait and see" approach taken by the FTC at the TRO stage will not work at this stage, where the Court must look beyond Vemma's policies to how the business operates in practice.  *Id.* at 883 ("To determine whether a MLM business is a pyramid, a court must look at how the MLM business operates in practice."); *see also Omnitrition*, 79 F.3d at 783–84; *Gold*, 177 F.3d at 479–82; *Amway*, 93 F.T.C. at 716.  Vemma's actual sales data is the exact opposite of what the FTC promised it would be.  There is no actual requirement to pay money, and almost half of the Affiliates choose **not** to purchase Affiliate Packs. [Carr Decl. ¶¶ 20-21.]

///

QB\36408757.7

1

2

**b.     The FTC Has Not Shown That Vemma Satisfies The Second Prong of the *Koscot* Test – Rewards Tied to Recruitment.**

3

In its Memorandum and at the Ex Parte Hearing, the FTC relied on Vemma's

4

"marketing of the business opportunity" and the "structure" of Vemma's business to argue

5

that Vemma *must* be encouraging inventory loading by tying rewards to recruitment.  [*See*

6

*generally* Memorandum; Hearing Tr., at 5, 13-14, 16-17.]  The FTC relies upon various

7

statements by Vemma to argue that "the business opportunity part of Vemma dwarfs the

8

actual product marketing part."  [Hearing Tr., at 5.]   But the FTC has cherry-picked

9

isolated statements regarding the business opportunity, while conveniently omitting

10

countless other statements – made in the same materials on which the FTC relies – that

11

focus on the promotion of Vemma's products.  [Wayment Decl. ¶¶ 47-48.]   Viewed

12

holistically, as it should be, the evidence supports a finding that Vemma is promoting

13

valuable health and wellness ***products***, and not just a business opportunity.  Indeed, if

14

there really was no desire to promote the products, then there would be no reason to spend

15

$500,000 on scientific studies to substantiate product claims, or over $ 5 million

16

promoting the Vemma products at sports venues.

17

Moreover, the FTC's entire argument that Vemma has violated the second *Koscot*

18

prong is based on the FTC's false assumption that inventory loading must exist because

19

Vemma's "CEO is explicitly telling people to inventory load."   [Hearing Tr., at 13.]

20

Based on this assumption, the FTC argued:

21

22

23

> [W]e are entitled to infer, and the Court may infer at this point, that people are buying the product for the reasons that the CEO has told them to buy the product, and that is for the inventory-loading purposes.  If that is true, then all the rewards flowing upline to the top of the pyramid would be based on inventory loading, not based on actual consumption.

24

[*Id.* at 16-17.]

25

Undeterred, the FTC further argued to the Court that all it needed to do to carry its

26

burden was "to show this is this company's own optimal scenario." [*Id.* at 17.] The FTC misstates the law. The FTC and the Court are ***not*** entitled to "infer" that Vemma operates a pyramid scheme simply because the CEO allegedly encourages inventory loading, which is a false assumption. Rather, a company's classification as pyramid or MLM depends on how it ***operates in practice***. *BurnLounge*, 753 F.3d at 883.

Recognizing this principle, the Court asked the FTC whether the ***effect*** of Vemma's policies and statements plays a role in determining whether it is a legitimate MLM. [Hearing Tr., at 22 ("And if the intent is having that effect I suppose. Do I go that far as well, that if the intent is having the desired -- if the program is having the effect as intended, that recruitment dominates?")] The Court even posed a pertinent hypothetical:

> What would the FTC do to -- let's say we're in a posture where I grant the application, restraining order goes into place, two weeks down the road we're here for a preliminary injunction hearing or further down the road than that we're here for a final trial on the merits and Vemma or Boreyko's attorneys bring in, in some form, individual customers or aggregate data that demonstrates that there are pure customers, people who are signed up only to buy the product to drink it or whatever in volume, ***how does that affect the argument you're making to me that the -- that the overwhelming or the predominant feature of this is downline recruitment and not actual, as you put it, getting the product out the door or outside the organization, loosely defined***?

[*Id.* at 21] (emphasis added). The FTC responded by acknowledging that under the Court's hypothetical, the business may not be a pyramid:

> If we're talking about no Affiliate Pack purchases or minimal level, I think that would create an interesting issue. I would have to think more about whether that's a violation. I think that the split is going to be more – is directed to redress. I mean, it may very well affect the ultimate redress and it may affect the ultimate injunctive relief that is appropriate.

[*Id.* at 22-23.]

The Court's hypothetical proved to be prophetic. The FTC told this Court that it would show that the vast majority of sales came from the sale of Affiliate Packs and auto-

ship purchases by Affiliates.  But Vemma has already demonstrated that the FTC has broken that promise:

- Affiliate Pack purchases accounted for only 15.8% of total sales in 2014, and just 7.8% of total sales in 2015 [Carr Decl. ¶ 36.];

- Average monthly auto-ship purchase was approximately $118.29 / 99.22 QV (2014) and $116.70 / 94.23 (2015) [*Id. ¶* 42, n. 17.]; and

- Total Affiliate Pack purchases and the auto-ship purchases by Affiliates were only 47% of total sales in 2014, and 41% total sales in 2015.  [*Id.*]

The FTC's request for a preliminary injunction fails for more than just these reasons.  As detailed in Dr. Carr's Declaration, based on an analysis of Vemma's actual sales data and not mere speculation, (a) just over half of the Affiliates purchased Affiliate Packs; (b) auto-ship purchases were unlikely to be solely for the purpose of earning a commission; (c) customers purchased a substantial amount of products; (d) inventory loading was unlikely; (e) a large percentage of Affiliate sales are likely purchases driven by consumption, rather than recruitment; and, (f) the majority of sales relate to consumption by ultimate users, both Affiliates and customers – not recruitment.  [*Id.* ¶¶ 56-57.] This evidence shows that the rewards paid by Vemma come primarily from sales of product to ultimate users, rather than recruiting.  At a bare minimum, it demonstrates that the Declaration of Stacie A. Bosley, Ph.D., is based on numerous flawed assumptions and opinions – contradicted by Vemma's actual sales data, which she did not consider – and is therefore unreliable.  [*See id.*, *passim.*]

That its sales figures so strongly suggest consumption is, standing alone, conclusive evidence that Vemma is a legitimate MLM, and not a pyramid scheme.  In *BurnLounge*, the Ninth Circuit focused heavily on BurnLounge's sales data, which strongly suggested that purchases were tied to "the opportunity to earn cash", in holding that BurnLounge satisfied the second *Koscot* prong.  *BurnLounge*, 753 F.3d at 884.

Vemma's sales data presents the polar opposite of BurnLounge's data.  This case finds a closer analogue in *Whole Living, Inc. v. Tolman*, 344 F. Supp. 2d 739, 746 (D. Utah 2004).  In *Whole Living*, the court found that there was "no incentive for a distributor to personally buy large amounts of the product to push it on a downline distributor."  *Id.*  In so holding, the court noted:

> Beyond the relatively small qualifying amount of $100 to $200 a month, ***no larger amount of purchases will increase a distributor's commission rate***, therefore there is no incentive for a distributor to purchase large amounts of non-refundable product to obtain large commissions.

*Id.* (emphasis added).   The same holds true in this case, where the qualifying amount for commissions is small (120QV) and "no larger amount of purchases will increase a distributor's commission rate."  *Id.*, n.3 ("These amounts are small compared to the large amounts of product purchases required in plans where there is a danger of inventory loading, such as the typical ***$2,000 to $5,000*** noted by the Amway ALJ and the ***several thousand of dollars worth of product each month that a distributor must have purchased in Omnitrition*** to qualify to obtain commissions on sales by downline distributors") (emphasis added); [see *also* Carr Decl. ¶ 42.]

The FTC should not be allowed to obtain preliminary injunctive relief, shutting down Vemma's business and freezing assets, when it cannot bridge the gap between the speculative, pyramid-like sales numbers it expected to see and the actual, legitimate MLM numbers Vemma has presented.

### c. Vemma Maintains And Enforces Policies That Deter Inventory Loading.

In *Amway*, the FTC determined that Amway was not a pyramid scheme based in part on evidence that Amway had adopted and was enforcing rules that deterred inventory loading.  These "Amway Rules" included the following:

> (1)  participants were required to buy back from any person they recruited any saleable, unsold inventory upon the recruit's leaving Amway, (2) every

participant was required to sell at wholesale or retail at least 70% of the products bought in a given month in order to receive a bonus for that month, and (3) in order to receive a bonus in a month, each participant was required to submit proof of retail sales made to ten different customers.

*Omnitrition*, 79 F.3d at 783.

Vemma has many of the same anti-inventory loading policies, including a one-year buy back policy and a "70% Rule". The FTC's position, however, is that these policies are "ineffective" or, in the case of the "10 customer rule," non-existent. [Memorandum, at 40-43.] But once again, the FTC's arguments are based on incorrect assumptions and misapplied law.

The FTC (and Dr. Bosley) contend that the buy back policy is not effective because "[r]eturns also reverse any bonus payments based on the returned purchase ***and there may be upline pressure to limit returns***." [FTC App., at 1544] (emphasis added). But in *Amway*, the FTC found that the same policy had the exact opposite effect – distributors were not incentivized to push product on recruits who did not want the product because product returns would result in the reversal of the commissions earned by the sponsoring distributor. *Amway*, 93 F.T.C. at 687.

The FTC also argues that shipping costs make the buy back policy ineffective. [Memorandum, at 42.] But Vemma's buy back rule is at least as effective as the rule espoused by the Direct Sales Association. http://www.dsa.org/code-of-ethics/buyback. And there is ***no*** evidence to support a finding that Vemma does not honor its buy back policy. In fact, the evidence shows the opposite: that Vemma regularly honors refund requests even after the stated term has expired, and has revised its policies to further reduce the costs of shipping for the cancelling Affiliate. [Wayment Decl. ¶¶ 53, 57.]

Vemma also has a "70% rule" to discourage inventory loading. [Tengan Decl. ¶¶ 22-23.] And despite the FTC's allegations that this rule is unmonitored and unenforced [*see* Memorandum, at 41], the evidence shows that Vemma monitors and enforces its 70%

QB\36408757.7

1    Rule.   [Tengan Decl. ¶¶ 22-29.]   Not only is the FTC's argument that "there is no

2    evidence that [the 70% rule] is monitored or enforced" simply wrong, but the FTC fails to

3    recognize that it has the burden of coming forward with evidence to satisfy its showing of

4    a likelihood of success on the merits.  [Memorandum, at 41.]  *See Whole Living, Inc.*, 344

5    F. Supp. 2d at 746 (ruling that the company's 70% rule deterred inventory loading

6    because "there [was] no evidence in this case that the 70% rule is not effective or

7    enforced.")

8         Finally, while it is true that Vemma does not have a "ten customer rule," such a

9    rule (which originated with Amway in the 1970's) does not fit the post-*BurnLounge* world

10   or the Vemma business model.  In *BurnLounge*, the Ninth Circuit confirmed that internal

11   consumption may be a sale to an ultimate user.  *BurnLounge*, 753 F.3d at 887.   That

12   means that a distributor could be purchasing product largely (or entirely) for personal

13   consumption.  *See* FTC Opinion at 2 (recognizing the legitimacy of a "buyer's club"

14   organized as an MLM).   Under those circumstances, requiring a distributor to also verify

15   that he has sold product to 10 other customers does not make any sense.

16        Furthermore, Vemma operates in a very different way than MLMs like Amway or

17   Omnitrition.  In those companies, the distributors purchased large quantities of inventory

18   at a discount to sell to customers for a retail profit, in addition to qualifying for bonuses

19   under the companies' compensation plans.  *See Amway*, 93 F.T.C. at 628; *Omnitrition*, 79

20   F.3d at 787.  In Vemma's case, there is little incentive for a distributor to purchase large

21   quantities of product and re-sell it, other than to be able to sell product immediately to a

22   prospective customer to satisfy an immediate desire to purchase.  [Wayment Decl. ¶ 58.]

23   Instead, most sales of product to customers are sales referred by an Affiliate, but fulfilled

24   directly by Vemma.  [*Id.*]  In other words, most of the time, the product being sold to a

25   customer is not passing through the hands of a sponsoring affiliate.  [*Id.*]    It could, and

26   does happen, but that is not the primary means of distributing the product.  [*Id.*]  Under

QB\36408757.7

this type of model, it makes no sense to apply a "ten customer rule."

> **2.     The FTC Has Not Demonstrated A Likelihood Of Success On The Merits On Its Claim That Vemma Has Made Income Misrepresentations.**

The FTC asserts that Vemma has made income misrepresentations in violation of Section 5(a) of the FTC Act, including statements in promotional materials and in their income disclosure statements.  [Memorandum, at 43-45.]

To prove their claims, the FTC must establish: (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material. *F.T.C. v. Gill*, 265 F.3d 944, 956 (9th Cir. 2001);   *F.T.C. v. Tashman,* 318 F.3d 1273, 1277 (11th Cir. 2003). "Courts look to the ***overall net impression*** of consumers when deciding whether particular statements or omissions are deceptive." *F.T.C. v. Bay Area Bus. Council, Inc.*, 2004 WL 769388, at *10 (N.D. Ill. Apr. 9, 2004) (emphasis added).  "The alleged misrepresentations should be evaluated as a whole without emphasizing isolated words or phrases apart from their context." *F.T.C. v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1106 (D. Kan. 2011) (quoting *F.T.C. v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008)); *see also, F.T.C. v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) (same).

The FTC has failed to demonstrate that it will succeed on its claim that Vemma made income misrepresentations.   First, the statements on which the FTC relies are nothing more than a "sales pitch" when viewed in conjunction with the disclaimers and income disclosures that the FTC acknowledges Vemma prepared and makes available to all Affiliates.  Second, Vemma's income disclosures are not false or misleading.  They are accurate disclosures of earnings actually received by Affiliates.

QB\36408757.7

a.      **Vemma's Statements Are Puffery When Viewed In Context.**

To support its misrepresentation claim, the FTC has cherry-picked isolated statements to create the false impression that Vemma misrepresented income opportunities to consumers.  [*See* Memorandum, at 17-21.]  These statements, however, are nothing more than sales pitches, or "puffery", when viewed in tandem with Vemma's disclaimers and income disclosure statements.

Puffery is ordinarily defined as "empty superlatives on which no reasonable person would rely." *F.T.C. v. Trudeau*, 579 F.3d 754, 765 (7th Cir. 2009); *All-Tech Telecom, Inc. v. Amway Corp.,* 174 F.3d 862, 868 (7th Cir.1999).   "When determining whether statements amount[] only to puffery, the court must analyze the ***context*** in which the statements were made." *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013) (citing *F.T.C. v. Trudeau,* 579 F.3d 754, 766 (7th Cir. 2009) ("In determining whether a statement is puffery, the context matters") (emphasis added).

Here, the effect of Vemma's "sales pitch" statements is negated by Vemma's disclaimers and income disclosures, which make abundantly clear the income Affiliates can expect.  As the FTC concedes, Vemma included "results not typical" disclaimers in many (if not most) of their income representations.  [*See* Memorandum, at 22.]  And these disclaimers were provided alongside the purported misrepresentations, rendering these statements "meaningless sales patter." *All-Tech Telecom*, 174 F.3d at 868.

In addition, Vemma published its 2014 income disclosure statement to consumers which, as the FTC admits, "reveal[s] that many Affiliates have not earned substantial sums". [Memorandum, at 45.]  Vemma's 2014 income disclosure statement could not be clearer, serving to put consumers on notice regarding income potential, and again rendering Vemma's statements mere puffery.  The Court correctly picked up on this

QB\36408757.7

1  during the Ex Parte Hearing:

> You've gone to the heart of what gave me pause since the first time I read
> these materials.  I understand that somebody can be standing up saying,
> "Here's the warnings but listen to what I'm telling you."  But if I have --
> what is wrong with the argument that somebody who gets this material and
> looks at the breakdown of income for 2013 and for 2014 and looks at it and
> says, "Gee, 96 1/2 percent of the people here don't make anything on this,
> or nearly anything, and 75% are in the hole or whatever it is.  How does --
> and goes forward with this.  I understand that the Federal Trade Act and the
> provisions that we're talking about right here were intended to modify buyer
> beware, caveat emptor; ***but at some point, if that information is in front of
> them, aren't they changed with the knowledge and judged able to
> recognize that what they are now hearing from Mr. Boreyko or from
> anyone else is a <u>sales pitch</u> to be compared against hard numbers?***

[Hearing Tr., at 25] (emphasis added).

Furthermore, the FTC cannot seriously contend that the net impression provided by Vemma's income statements is deceptive to a reasonable consumer when Vemma's 2013-2015 sales data indicate that the vast majority of Vemma's Affiliates and customers are purchasing products for consumption, and ***not*** to participate in the business opportunity. When viewed against the backdrop of all the information Vemma provided to Affiliates and customers, and the sales data indicating how consumers react to that information, the statements characterized as actionable misrepresentations by the FTC amount to nothing more than a sales pitch.

Because the FTC has failed to show that Vemma's statements regarding income are "likely to mislead customers acting reasonably under the circumstances",  *Gill*, 265 F.3d at 956,  the FTC has failed to carry its burden for obtaining injunctive relief on its misrepresentation claim.  But even if the Court finds that the FTC has shown a likelihood of proving that Vemma has made certain income misrepresentations, the FTC has still not met its burden of showing that Vemma is a pyramid scheme.  Therefore, any injunction that issues can, and should, be narrowly tailored to those disclosures, and not  the operation of Vemma's business. *See supra*, at ¶ 40.

QB\36408757.7

**b.** **Vemma's Earnings Disclosure Statements Are Not False Or Misleading.**

Despite admitting that Vemma's earnings disclosures "reveal that many Affiliates have not earned substantial sums", the FTC argues that Vemma's 2013 and 2014 Disclosure Statements are false and misleading.  [Memorandum, at 45-46.]  Once again, the evidence demonstrates otherwise.

The information relating to average earnings contained in these Disclosure Statements is pulled from Vemma's commissions data.  All Affiliates who earned a commission at any time during the calendar year for that disclosure period are reflected in the statistics.  By definition, these Affiliates were "active" because "inactive" Affiliates would not have earned the commission.[6]  On the face of the Disclosure Statements, Vemma makes clear that the information stated reflects average annual *earnings*.  Vemma did not disclose average *net profits* (or losses) of Affiliates because it would be impractical, difficult, and likely misleading to disclose such information.  [Carr Decl. ¶ 22.]

To accurately determine the average net profit of Affiliates, one would have to consider the Affiliates' personal consumption of the product, as well as retail sales made by the Affiliate.  While Vemma has policies prohibiting inventory loading and requires Affiliates to certify with each order that they have consumed or sold at least 70% of the products previously purchased, Vemma does not collect information from Affiliates as to how much of the product they purchased was sold retail (and what the Affiliate's profit margin on those sales were), or how much of the product purchased was consumed by the Affiliate.  In addition, Vemma only requires its Affiliates to certify that *at least* 70% of

---

[6]     As stated in the Compensation Plan, the Affiliate must be qualified to earn a commission and being qualified necessarily means the Affiliate is "active" within the meaning of the Compensation Plan.

the product purchased was consumed or sold retail.  But in many cases, Affiliates are likely consuming more than 70% of the product they are purchasing.  However, Vemma does not collect that information and, therefore, attempting to prepare a Disclosure Statement of ***net profit*** would be unreliable and likely misleading.  [Wayment Decl. ¶ 52.]

The FTC's contention that Vemma's Disclosure Statements are misleading because they do not factor in costs of participation or other expenses, or misidentify Affiliates or customers, directly contradicts the FTC's own position set forth in its comments to the Final "Business Opportunity Rule."  In refusing to apply the "Business Opportunity Rule" to MLMs, the FTC explained:

> First, as the Commission has acknowledged, ***the varied and complex structure of MLMs makes it exceedingly difficult to make an accurate earnings disclosure and likely would require different disclosures for different levels of participation in the company. For instance, it would be difficult to craft an accurate earnings disclosure that would account for "inactive" participants that use their distributorship as a "buyers club" and are interested only in purchasing goods at a wholesale price for their own use.*** This problem appears to be unique to MLMs and, so far as the Commission is aware, does not arise in other forms of business opportunities. ***Furthermore, it may be difficult to determine retail income if the MLM is not in a position to verify the extent to which a distributor has resold the product at retail, is warehousing the product, or bought the product for his or her own personal consumption***.

19 CFR Part 437 (emphasis added).

In sum, the FTC has not shown a likelihood of successfully proving that Vemma's Disclosure Statements were false or misleading.  The information contained in the Disclosure Statements is truthful, and the information omitted that the FTC contends renders these Disclosure Statements "misleading" is the same sort of information its own guidance acknowledges is difficult, if not impossible, to implement in an MLM business organization.

### 3. The Balance Of The Equities Favors Denying Injunctive Relief Because The TRO And Proposed Preliminary Injunction Are Overly Broad And Unduly Burdensome.

An injunction should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" *Califano v. Yamasaki*, 442 U.S. 682, 702 (U.S. 1979).   As noted throughout, the TRO, and the asset freeze and appointment of a temporary receiver thereunder, has resulted in the summary closure of the entire Vemma business.  [Wayment Decl ¶ 82.]  Given that Vemma operates a legitimate MLM business, and not a pyramid scheme, as demonstrated above, the TRO is overly broad and unduly burdensome, as is the proposed preliminary injunction.  *See F.T.C. v. Loewen*, No. C12-1207MJP, 2012 WL 4045207, at *4 (W.D. Wash. Sept. 13, 2012) (balance of equities tipped in favor of defendants where FTC's proposed TRO imposed hardships on defendants, including an asset freeze); *Merch. Servs. Direct*, 2013 WL 4094394 at *4 ("***Given that the FTC has not established a high likelihood of success on the merits, the risk of putting Defendants out of business is unacceptable***") (emphasis added).

Furthermore, the FTC has not demonstrated that any alleged violations of the FTC are ongoing, or are likely to recur – a requirement for granting preliminary injunctive relief.  *Evans Products Co.*, 775 F.2d at 1087.  As demonstrated throughout, Vemma's sales data shows that Vemma's sales are not based in any significant part on Affiliate Pack purchases and auto-ship sales to Affiliates, inventory loading is not occurring, and that sales reflect consumption, not recruitment.   Simply put, Vemma's continued operation poses no current threat to the public, while on the other hand, a continuation of the TRO will kill the business.  As such, the balance of the equities tips heavily in Vemma's favor, and the TRO should either be dissolved, or tailored to address only those specific practices, if any, that the FTC can show a likelihood of successfully proving based on evidence, and not just theories.

QB\36408757.7

4.    **In The Alternative, The TRO Should Be Narrowly Tailored To Address Only The Alleged Violations Of The FTC Act.**

The FTC recognized that the Court may need to modify the TRO if Vemma submitted evidence indicating that Vemma is not a pyramid scheme:

> So if there is a large volume of customers out there that are buying one-off products or something tells us there's not a good inference that they are buying it for business opportunity purposes, I think that will affect the redress and it will affect ultimately the injunctive relief.

[Hearing Tr., at 23.]   The Court has even suggested the appropriate modification: "It would be to basically strip out the pyramid elements but not disrupt – or take out the whole business."  [*Id.* at 23.]

Vemma does not concede that ***any*** elements of Vemma's operations are pyramidal in nature.   But if the Court has any concerns about aspects of Vemma's business operations or representations, it should modify the injunctive relief in a way that addresses just those concerns, without shutting down the company.

B.    **The Temporary Receiver Should Be Dismissed.**

1.    **Receiverships Are Extraordinary Remedies Of Last Resort.**

Appointment of a receiver is an extraordinary and drastic remedy.   *Solis v. Matheson*, 563 F.3d 425, 437 (9th Cir. 2009); *Sterling Sav. Bank*, 656 F. Supp. 2d at 1258-59; *Bracco v. Lackner*, 462 F. Supp. 436, 456 (N.D. Cal. 1978).  The appointment of a receiver interferes severely with a defendant's property rights by ousting him or her from control.   *Solis*, 563 F.3d at 437.   Therefore, "[t]he appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution and granted only in cases of clear necessity to protect plaintiff's interests in the property."  *Id.* at 437 (*citing* 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983, at 24 (2d ed.1997)).   It is such an extraordinary remedy that it is

-35-

"warranted only by the most compelling circumstances." *Bracco v. Lackner*, 462 F. Supp. at 456.   In fact, a receivership is a "remedy of last resort; ***a receiver should not be appointed if a less drastic remedy exists***." *Id.*  (emphasis added).

The appointment of a receiver is not a matter of right or entitlement and the Court has broad discretion in deciding whether to appoint a receiver.  *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 845 (9th Cir. 2009); *Securities and Exchange Commission v. Lincoln Thrift Ass'n,* 577 F.2d 600, 606 (9th Cir. 1978) ("[I]t is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership."); *Hutchinson v. Fidelity Inv. Ass'n,* 106 F.2d 431, 436 (4th Cir. 1939) ("It should not be forgotten that the appointment of a receiver is not a matter of right, but one resting in the sound discretion of the court."); *Sterling Sav. Bank v. Citadel Dev. Co.*, 656 F.Supp. 2d 1248, 1258 (D. Or. 2009); *Peterson v. Islamic Republic of Iran,* 563 F.Supp. 2d 268, 277 (D. D.C. 2008) ("The appointment of a receiver is an equitable remedy of rather drastic nature available at the discretion of the court....")

Because it is an extraordinary remedy, a request for appointment of a receiver should not be granted without careful consideration of the federal receivership factors. *Canada Life,* 563 F.3d at 844; *Sterling Sav. Bank*, 656 F. Supp. 2d at 1258.  "Furthermore, the court should use caution when appointing a receiver and should make findings on the federal factors." *Sterling Sav. Bank*, 656 F. Supp. 2d at 1258; *see Solis,* 563 F.3d at 438. "The court 'has the authority to order a receivership, but only after evidence has been presented and findings made showing the necessity of a receivership.'"  *Id.* at 1260 (quoting *Solis*, 563 F.3d at 438).   Whether a federal receivership is appropriate is dependent on the facts of the case, which are typically developed after a full trial or evidentiary hearing.

Although there is no specific formula for the appointment of a receiver, as set forth by the Ninth Circuit, there are a variety of factors federal courts have considered when

determining whether a receiver should be appointed, including whether: (1) the party requesting a receiver has a valid claim; (2) there is fraudulent conduct or the probability of fraudulent conduct  by the defendant; (3) the property is in imminent danger of loss, concealment, injury, diminution in value, or squander; (4) the legal remedies are inadequate; (5) the harm to plaintiff by denial of a receiver would outweigh injury to defendant opposing a receiver; (6) the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; and, (7) whether plaintiff's interests will be well-served by the receivership.  *Canada Life,* 563 F.3d at 844 (alterations in original) (*citing* 13 James Wm Moore et al., Moore's Federal Practice 66.04[2][b] (3d ed. 2008)); *Solis*, 563 F.2d 425, 438; *Sterling Sav. Bank* at 1258.[7]

Additionally, the preservation of the financial status quo was a key consideration in many cases where a receiver was considered.  *F.T.C. v. Crescent Publishing Group*, 129 F. Supp.2d 311, 319 (S.D.N.Y. 2001) (denying appointment of receiver as part of preliminary injunction because less restrictive measures would be sufficient to preserve the defendants' financial assets and protect the public interest).

Ultimately, the district court may consider a host of relevant factors, and no single factor is dispositive.  *Canada Life*, 563 F.3d at 845.  The plaintiff bears the burden of proving that these factors are present in such a way that makes the appointment of a receiver necessary.  *Canada Life*, 563 F.3d at 845; *Sterling Sav. Bank*, 656 F. Supp. 2d at 1259.  The Ninth Circuit has vacated the appointment of a receiver when there was no finding on the record of any of the relevant factors before determining that a receiver

---

[7] As noted in *Canada Life,* the Ninth Circuit had previously applied two additional factors:  "whether the defendant was of doubtful financial standing" and "whether the property was of insufficient value to insure payment."  *Canada Life,* 563 F.3d at 844. Proof of these two factors may be sufficient to appoint a receiver to collect rents or other revenue from the subject property, but these two factors alone are not sufficient to appoint a receiver with the added power to manage the property.  *Sterling Sav. Bank*, 656 F. Supp. 2d at 1259.

1   would be automatically appointed.  *Solis*, 563 F.2d at 38.  In *Sterling Savings Bank*, after

2   an extensive analysis of the *Canada Life* factors and the two "previously applied" factors,

3   the Court concluded that the plaintiff had failed to show sufficient evidence that a receiver

4   was necessary and denied the motion for appointment.  656 F. Supp. 2d at 1264-65.

5         "***The most important factor for a court to consider when deciding whether to***

6   ***appoint a receiver is if an alternative remedy appears likely to be successful***."  *Cobell v.*

7   *Norton*, 226 F.Supp. 2d 1, 146 (D. D.C. 2002), vacated on other grounds, 334 F.3d 1128

8   (D.C. Cir. 2003) (emphasis added).  The Supreme Court has held that where provisional

9   remedies are adequate, receivership is not appropriate.  *Kelleam v. Maryland Cas. Co. of*

10  *Baltimore Md.,* 312 U.S. 377, 381, 61 S. Ct. 595, 598 (1941) (holding that a receiver

11  should not have been appointed because the surety could be adequately protected by

12  provisional remedies or otherwise).  Other courts have found that the adequacy of the

13  security and the financial stability of the defendant should be given considerable weight

14  when determining whether to appoint a receiver.  *New York Life Ins. Co. v. Watt West*

15  *Development Corp.*, 755 F.Supp. 287, 292  (E.D. Cal. 1991).

16                    **2.      An Analysis Of The Relevant Factors Demonstrates**
                    **That Appointment Of A Receiver Is Not Warranted**
17                    **In This Case**.

18        Courts in this Circuit have recognized that the *Canada Life* factors apply and must

19  be met by the government when the FTC or other federal agencies seek appointment of a

20  receiver.  *See*, *e.g.*, *F.T.C. v. Pricewert LLC*, 2009 WL 1689598  at *1 (N.D. Cal. June 15,

21  2009) ("Among other things, the court may consider whether there is an imminent danger

22  of loss of property, the inadequacy of legal remedies, and whether harm to be caused by

23  denying the appointment would outweigh harm to the party opposing the appointment of a

24  receiver, if one is appointed.")  The District of Nevada also recognized that the factors set

25  forth in *Canada Life* should be evaluated when determining whether the Securities and

26  Exchange Commission's request for appointment of a receiver should be granted.  *S.E.C.*

1    *v. Fujinaga*, 2015 WL 757875 at * 6 (D. Nev. Feb. 23, 2015).  The Northern District of

2 California also evaluated the *Canada Life* factors in cases in which the U.S. Small

3 Business Administration was requesting a receiver.  *U.S. v. Novus Ventures II L.P.*, 2012

4 WL 3257524 at * 6 (N.D. Cal. Aug. 8, 2012) (recognizing that Small Business Investment

5 Act authorizes the court to appoint a receiver, but does not mandate such appointment,

6 and proceeding with analysis of factors).

7        The FTC does not cite or discuss the required *Canada Life* factors in their

8 materials.  A review of the actual evidence before the Court establishes that the FTC does

9 not come close to meeting its burden under the *Canada Life* (or any other applicable) test

10 for the appointment of a receiver.

11        <u>First</u>, the FTC has produced ***no actual evidence of any kind*** to support their

12 assertions that there is some kind of imminent risk that assets will be concealed or

13 improperly dissipated, or that the Vemma will operate in an illegal manner going forward,

14 if a receiver is not appointed.  In fact, the ***only*** "evidence" even submitted by the FTC on

15 these points was the Declaration of Counsel Angeleque P. Linville (Dkt. # 15) (the

16 "**Linville Declaration**").  The Linville Declaration has been withdrawn in its entirety by

17 the FTC (and thereby all testimony or other matters presented through the declaration are

18 withdrawn).[8]  The FTC request for a receiver must be denied as a threshold matter

19 because they have produced no evidence to support the request.

20        <u>Second</u>, as discussed and demonstrated above, the evidence shows that the FTC is

21 not likely to prevail on its claims of violations of Section 5(a) of the FTC Act.  Even if the

22 FTC can establish a likelihood of prevailing on some aspect of their claims, and as

23 discussed above, any injunctive relief should be limited to a prohibition of only those

---

24 [8]     The FTC simply asks the Court to assume, in the absence of any actual evidence,

25 that "the risk that Defendants' business will continue to operate lawfully is extremely high, and it is inconceivable that they can be relied upon to immediately develop a legal

26 business model." [Memorandum, at 60.]

1    specific business operations that may be implicated by such claims.  The remainder of
2    Vemma's business should be allowed to continue.

3

4        Third, the evidence shows that Vemma has not operated in a fraudulent manner,
5    and that in all events Vemma can and should be allowed to operate in a going forward
6    manner under their modified interim business operation proposal.  [Wayment Decl. ¶¶
7    104-106; MCA Report, at § VII(G), pp. 23-24.]

8        Fourth, not only is there no evidence of imminent danger of loss, concealment,
9    injury, diminution in value or squander by Vemma, the evidence actually shows that
10   Vemma has in place, and under their modified interim operation proposal will continue to
11   operate with, proper corporate procedures, policies, and safeguards that ensure proper
12   operation and preservation of and reporting on assets and operations.  There is no
13   evidence of any kind to support the notion that Vemma would violate the reporting and
14   other requirements of the proposed interim operation proposal, or any orders this Court
15   may enter regarding future operations.

16       Fifth, the evidence shows that the real threat of loss and diminution of assets is
17   created by the temporary receiver staying in place.  The evidence is overwhelming that the
18   summary termination of operations by the temporary receiver is destroying the asset and
19   going concern value of Vemma, and creating loss not only for Vemma but for Vemma's
20   many creditor and other constituencies.

21       Fifth, legal remedies are absolutely adequate in this case.  Vemma's proposed
22   modifications to its business operations discussed above provide for allow Vemma to
23   operate on an interim basis with full transparency and cooperation with the FTC, and
24   under this Court's supervision.

25       Sixth, the harm to the FTC by denial of a permanent receiver does not outweigh the
26   injury to Vemma if the receivership is lifted under the terms Vemma has proposed.  The

temporary receiver has already caused incalculable, and potentially irreparable, injury to Vemma by immediately shutting down business operations completely starting the day after he took over, and that injury increases with each passing day.  Denying Vemma the ability to operate under its modified operations proposal set forth above on interim basis ensures that the going concern value of the business will decline rapidly.  However, if operations are allowed on the modified interim basis as proposed by Vemma, there will be no harm to the FTC, Affiliates or consumers.

Seventh, in addition to the fact that the FTC has not met its burden that it will likely succeed on the merits of its claims, there is not risk of irreparable injury to the FTC because, as discussed above, removing the receiver and allowing Vemma to operate on their proposed modified basis will actually preserve and increase asset value.  There can be no dispute that asset values are being diminished by the shut down of Vemma's business.  In addition, Vemma's proposed interim operations provide for full cooperation with the FTC and the supervision of the Court to ensure same.

Eighth, any legitimate FTC interests are not well-served by the receivership.  The FTC's interests are to ensure that there are not violations of the FTC Act.  For all of the reasons discussed above, the FTC is unlikely to prevail on their claims, and in all events, the interim operations proposed by Vemma ensure proper and Court supervised operation pending the final determinations in this case.  Simply shutting down the entirety of a business when it has the ability to operate in a lawful manner does not serve anyone's interests.

### 3. The Temporary Receiver Must Be Removed Because Rather Than Maintaining The Status Quo, He Has Simply Begun Liquidating The Company And Then Subsequently Tried To Find Justification.

Preservation of the financial status quo is also a key consideration in the decision to grant or deny the appointment of a receiver.  *See F.T.C. v. Crescent Publishing*, 129 F.

1  Supp. 2d at 319.  The decision whether to remove a receiver is – as with the decision to

2  appoint a receiver – at the discretion of the district court.  *Securities and Exchange*

3  *Commission v. Spence and Green Chemical Co.*, 612 F.2d 896, 904 (5th Cir. 1980).  A

4  receivership should be terminated and control returned to those who own the business as

5  soon as the reason for its imposition ceases.  *Id.*

6        The FTC represented to this Court that a temporary receiver should be appointed to

7  "***take over the corporate Defendants' operations, preserve evidence, and marshal assets***.

8  By timely reporting the status of Defendants' operations, the receiver can assess the nature

9  of their business and, ***if instructed***, wind down the unlawful operations." [Memorandum,

10 at 60] (emphasis added).  However, the Temporary Receiver did the exact opposite of

11 maintaining the status quo.  The Receiver instead summarily shut down Vemma with

12 essentially no meaningful analysis, and it has made clear that it has no intention of re-

13 starting any operations of any kind.

14       The evidence shows: (a) the temporary receiver's "analysis" for its summary

15 actions is essentially non-existent or superficial and faulty [*See, e.g.*, MCA Report, at §

16 VII(f), pp. 15-23.]; (b) the temporary receiver has ignored repeated requests by Vemma's

17 management to re-start operations that are not implicated at all by the FTC's claims; and

18 (c) the temporary receiver's decision to shut down Vemma is diminishing and destroying

19 assets and going-concern values; and (d) Vemma's interim operation proposal provides

20 for preservation of value in a transparent and Court-supervised manner.

21       Under these circumstances, there is no basis for continuing the receivership and it

22 should be terminated under the terms proposed by Vemma.

23            **C.    The Court Should Eliminate Vemma's Inability To File A**
                    **Petition(s) Under The United States Bankruptcy Code.**
24

25       In all events, and irrespective of other relief that may be ordered by the Court, the

26 restrictions in the TRO that preclude Vemma from filing for relief under the United States

Bankruptcy Code should be lifted permanently.

Vemma should be allowed to file for relief under the Bankruptcy Code so their future operations, restructure (and if necessary, liquidation), and treatment of all interested parties and constituencies can be conducted under the appropriate and comprehensive federal statutory framework designed to address such issues and take account of all of the interested and affected parties.  [*See* Wayment Decl. ¶ 107.]

### 1. It Is Well Recognized That Complex Companies Should Not Be Restructured Or Liquidated In A Receivership.

Courts have recognized that receiverships should not "perform the functions of the bankruptcy court." *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964).  Generally, appellate courts prefer bankruptcy court to receiverships for liquidation proceedings.  *See Gilchrist v. General Elec. Capital Corp.*, 262 F.3d 295, 303-304. (4th Cir. 2001).  The Fourth Circuit has stated that the Bankruptcy Code reveals that Congress intended for the bankruptcy process to be favored in liquidation circumstances. *Id*.  Bankruptcy courts are well equipped and designed to handle liquidations.

When there are many other constituencies besides the immediate parties involved in the litigation, such as creditors, employees, or other related businesses, a federal receivership is not the appropriate vehicle to handle a liquidation or a reorganization.  *See Id*.  A district court is limited in its ability to address competing claims over the same assets.  *See id*.  A receiver is simply not equipped to liquidate a large corporation with large numbers of creditors.  *See id*.  In short, a restructure or even liquidation of a company through a receivership is inherently unsound.  *See, e.g., SEC Receivers vs. Bankruptcy Trustees: Liquidation by Instinct or Rule,* Marcus F. Salitore, American Bankruptcy Institute Journal, at *45-46 (October 2003) (*citing SEC v. TLC Investments and Trade Co.*, 147 F.Supp. 2d 1031, 1034 (9th Cir. 2001)); *see also SEC v. American Bd.*

QB\36408757.7

*of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir 1987) (criticizing liquidating receiver for selective application of bankruptcy concepts).

These concerns are particularly applicable in this case. Vemma is a large and complex company. Many creditors, affiliates, and other parties are affected by the future of Vemma. The temporary receiver has simply shut down Vemma with no real analysis and certainly no coherent plan for future disposition of the company. Because of the harm already inflicted by the actions of the FTC and the temporary receiver, there is a real possibility that Vemma will need to restructure its overall affairs. The TRO and the Preliminary Injunction Order proposed by the FTC provide no mechanisms for addressing the many issues that arise in a restructure or even liquidation of the company. The orders essentially give the temporary receiver complete discretion in what he does with operations, creditors, debts, assets, and all other matters relating to the company. This is neither coherent or proper.

## 2. The Federal Receivership Does Not Preclude A Bankruptcy Filing.

Receiverships generally do not preclude bankruptcy filings. *U.S. v. Royal Business Funds Corp.*, 724 F.2d 12, 17 (2d Cir. 1983); *In re Federal Shopping Way, Inc.*, 433 F.2d 144 (9th Cir. 1970); *see* 11 U.S.C. § 543. Congress recognizes that, by virtue of including section 543 of the Bankruptcy Code, which provides for turnover by a custodian.[9]

When a federal court has entered an order prohibiting an entity from filing bankruptcy, there are several factors applicable to the determination of whether the prohibition should be lifted even if a receiver has been appointed in the matter: (1) whether the receivership/liquidation of the entity is substantially completed; (2) whether

---

[9] Pursuant to 11 U.S.C. § 101(11) , the definition of a "custodian" includes a receiver.

QB\36408757.7

1   bankruptcy is a better option compared with other available non-bankruptcy methods of

2   liquidation or reorganization; (3) the number of creditors other than the plaintiff; (4)

3   whether the defendant consented to the receivership; (5) what is in the best interests of the

4   entity and parties; and (6) whether fraud or mismanagement was the reason for the

5   receiver being appointed.  *See*, *e.g., U.S. Royal Business Funds*, 724 F.2d at 15-17;

6   *Securities and Exchange Commission v. Lincoln Thrift Association,* 577 F.2d 600, 606-

7   608 (9th Cir. 1978); *Esbitt*, 335 F.2d at 143-144.

8          The most important factor in the majority of courts' analysis is what stage of

9   liquidation the receivership is in when the defendant requests to file a bankruptcy petition,

10   if the receivership is in its early stages a filing should be allowed.  *See, e.g., U.S. Royal

11   Business Funds*, 724 F.2d at 16; *Lincoln Thrift Ass'n*, 577 F.2d at 607-608; *Esbitt*, 335

12   F.2d at 143.  Courts also consider whether bankruptcy court is the better option for

13   reorganization or liquidation, compared with available non-bankruptcy options.  *In re

14   Republic Trust & Sav. Co.*, 59 B.R. 606 (N.D. Okla. 1986).  The availability of federal or

15   state procedures for liquidation does not mean an entity is ineligible for bankruptcy relief.

16   *Id.*  What is important is whether bankruptcy is a better venue.  Many courts have held

17   that bankruptcy courts are a better and more proper choice for liquidation or restructure

18   proceedings.  *Esbitt*, 335 F.2d at 143; *Los Angeles Trust Deed & Mortgage Exchange v.

19   SEC*, 285 F.2d 162, 182 (9th Cir. 1961).

20          Every applicable factor supports the Court lifting the prohibition on a bankruptcy

21   filing by Vemma.  The receivership is in its earliest stages.  Because of the size and

22   complexity of Vemma, and the number of affected parties and constituencies, the statutory

23   bankruptcy framework designed to deal with restructure or liquidation of such entities is

24   far superior to a receivership.  Vemma has a very large number of creditors who will be

25   affected by its future operation or disposition.  Vemma strongly disputes that any

26   receivership is proper.  For the reasons discussed above in Section III.B., continued

QB\36408757.7

operation of Vemma under Court supervision in the interests of Vemma and all interested parties. A federal bankruptcy court is designed for and best equipped to supervise such a process. Finally, the evidence shows that Vemma and its management have not engaged in fraud or mismanagement; and more importantly, Vemma's interim operation proposal provides for transparent and court supervised operation (including in a bankruptcy proceeding).

## IV.    CONCLUSION.

For these reasons, the FTC has not met its burden for issuance of the preliminary injunction, continued asset freeze, and the continued appointment of a receiver over the Vemma's assets and operations. The Motion should be denied in its entirety.

RESPECTFULLY SUBMITTED this 10th day of September, 2015.

QUARLES & BRADY LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391

By  */s/ Kevin D. Quigley*
 Brian R. Booker
 John A. Harris
 Kevin D. Quigley
 Edward A. Salanga
 John S. Craiger

Attorneys for Defendants Vemma Nutrition Company and Vemma International Holdings, Inc.

ORIGINAL electronically filed this 10th day of September, 2015 with the Clerk of the District Court.

QB\36408757.7

1     COPY mailed and emailed this
      10th day of September,  2015, to:

2

      Angelique P. Linville
3     Jason C. Moon
      Anne D. LeJeune
4     Federal Trade Commission
      1999 Bryan Street, Suite 2150
5     Dallas, Texas 75201
      alineville@ftc.gov
6     jmoon@ftc.gov
      alejeune@ftc.gov
7     erobinson@ftc.gov

8     Attorneys for Plaintiff Federal Trade Commission

9

10    */s/ Kelly Thwaites* _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

QB\36408757.7