1
2
3
4
5
6

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV-15-01578-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Vemma Nutrition Company, *et al.*, | |
| Defendants. | |

On August 17, 2015, Plaintiff Federal Trade Commission ("FTC") filed its Complaint for Permanent Injunction and Other Equitable Relief against Vemma Nutrition Company, Vemma International Holdings, Inc., Benson K. Boreyko a/k/a B.K. Boreyko, and Tom Alkazin as Defendants, and Bethany Alkazin as Relief Defendant, under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b). (Doc. 3.) On August 21, 2015, the Court held an *ex parte* hearing and entered a Temporary Restraining Order (TRO), in which the Court appointed a Receiver over Vemma Nutrition Company and Vemma International Holdings (collectively, "Vemma" or "Corporate Defendants") and ordered an asset freeze with respect to Vemma and Mr. Boreyko. (Doc. 25.) After Defendants received notice of this action, the Court extended the expiration date of the TRO to September 18, 2015, on stipulation of the parties. (Doc. 40.) Upon consideration of the FTC's briefs and evidence in support of its request for continued injunctive relief in the form of a preliminary injunction (Docs. 9-15, 30, 59, 88, 101), Defendants' briefs and evidence in opposition (Docs. 70-71, 74-75, 78, 82), and the arguments and evidence presented at the Preliminary Injunction hearing

held on September 15, 2015, (*see* Docs. 102, 100), the Court will grant in part the FTC's request for a preliminary injunction against Defendants.

## I.   ENTITLEMENT TO PRELIMINARY INJUNCTIVE RELIEF

Section 13(b) of the FTC Act allows the Court to grant the FTC a preliminary injunction upon a showing that, considering the FTC's ultimate likelihood of success on the merits and weighing the equities, a preliminary injunction is in the public interest. 15 U.S.C. § 53(b). The FTC "need not show irreparable harm to obtain a preliminary injunction." *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999); *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984). The Court already concluded that the FTC showed that it was likely to succeed on the merits and the balance of equities tipped in its favor in granting the TRO, although the Court's evaluation at that time was done without the opposition of Defendants. The Court now examines whether the FTC has still met its burden to show that it is likely to succeed on the merits of its claims against Defendants and the balance of equities tips in its favor, in light of the arguments and evidence presented by Defendants.

### A.   Likelihood of Success on the Merits

#### 1.   Operation of an Illegal Pyramid Scheme

The FTC first claims that Defendants violate the FTC Act's prohibition on "unfair or deceptive acts or practices in or affecting commerce" by operating a pyramid scheme. *See* 15 U.S.C. § 45(a); *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 880 (9th Cir. 2014). A pyramid scheme, like a simple chain letter, ensures that most of its participants will lose money and is thus, by its very design, unfair and deceptive under the FTC Act. *See Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781 (9th Cir. 1996); *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1178, 1181 (1975), *aff'd mem. sub nom, Turner v. FTC*, 580 F.2d 701 (D.C. Cir. 1978) ("*Koscot*").

##### a.   Factual Findings

Defendant Vemma is a multilevel marketing company, founded and run by Defendant Mr. Boreyko, that sells nutrition and energy drinks through a network of

members it calls Affiliates. Affiliates are those participants who seek to avail themselves of the business opportunity of promoting Vemma and/or selling Vemma products and thereby earn bonuses, as opposed to customers, who are solely or primarily interested in purchasing Vemma products for their own consumption. While no purchase, payment or fee is required to become an Affiliate under Vemma's policies and the Affiliate Agreement, in practice, Vemma strongly encourages any person wanting to become an Affiliate to (1) purchase an Affiliate Pack—currently costing $600 and containing Vemma products, audio and video recordings, printed materials and branded items—upon which eligibility for certain bonuses is contingent, and (2) sign up for $150 monthly auto-delivery of two cases of product to maintain eligibility for bonuses.

There are multiple Affiliate levels, and an Affiliate's rank and bonus eligibility depends on the number of "personal volume" (PV or QV) points the Affiliate earns in a specified period. Defendant Tom Alkazin is one of Vemma's top Affiliates and actively promotes Vemma's business opportunities. Vemma refers to all Affiliates introduced directly or indirectly to Vemma under a certain Affiliate as a "sales organization," and an Affiliate qualifies his/her sales organization for bonus compensation by (1) remaining "active," and (2) for the sales organizations of lower level Affiliates, acquiring 120 PV points per period—the points requirement for the sales organizations of higher level Affiliates is higher. To remain "active" for bonus compensation purposes, an Affiliate must recruit or have previously enrolled two Affiliates who are also active in the specified period. PV points are acquired through the purchase of product by an Affiliate or any of the Affiliate's personally-enrolled Affiliates or customers.

As Mr. Boreyko explained in a 2014 presentation on becoming an Affiliate:

> [A]fter you're done with our affiliate pack, you need to get on an auto-delivery order. Do the two—what I would do is I would get four of those variety packs, two cases, 120 points. That is like your trump card. That makes sure you're qualified. And here's the thing, yes, you can qualify with customers, but you know what, sometimes customers don't order and they don't tell you they don't order, and all of a sudden you're like, hey, I didn't get—I wasn't qualified.

Likewise, the "Two & Go" program, which Mr. Alkazin helped create and which went into effect in June 2015, teaches new Affiliates to purchase an Affiliate Pack, get on monthly auto-delivery to ensure eligibility for bonuses, recruit two new Affiliates the first week, teach those Affiliates to do the same, and so on.

A representative of the Receiver testified at the Preliminary Injunction hearing that Vemma's own accounting records show that, in 2013, approximately 86% of its U.S. product sales were to participants classified as Affiliates, and 14% of U.S. sales were to participants classified as customers; in 2014, approximately 71% of U.S. product sales were to Affiliates and 29% were to customers.[1] Much of Vemma's contention that it is not a pyramid scheme is based on its proposal to reclassify many of its Affiliates, as currently shown in its own records, to customers, which would have the effect of decreasing the amount of sales to Affiliates and increasing the amount of sales to customers. However, Defendants' proposed reclassification of Affiliates to customers—as urged by Defendants' expert, Dr. Carr—is not based in fact. Defendants have offered no evidence to support a finding that a Vemma participant who intended to be just a customer accidentally identified himself or herself as an Affiliate, or had any motivation to do so. In addition, as the FTC points out, the reclassification proposed by Defendants would serve to misrepresent how many failed Affiliates there likely are. Indeed, the present data shows that, between January 2013 and August 2015, more than 73% of Affiliates who received commissions did not earn enough to recoup their investment in Vemma's programs.

Vemma has a policy of contacting 15 of its over 90,000 Affiliates every month to ask if at least 70% of their purchases were for consumption or retail. In practice, the Receiver found that Vemma is five months behind in completing these audits and has never disciplined or suspended an Affiliate for failing to certify that 70% of purchases were for consumption or retail.

---

[1] At the September 15, 2015, Preliminary Injunction hearing, the Receiver's representative testified that Vemma's information technology group revised the sales figures after the Receiver filed his report, and so he provided the revised figures.

### b.  Legal Standards and Analysis

"Pyramid schemes are said to be inherently fraudulent because they must eventually collapse." *Omnitrition*, 79 F.3d at 781. The Ninth Circuit employs the FTC's pyramid scheme test as set forth in *Koscot*:

> [A] pyramid scheme is characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.

*BurnLounge*, 753 F.3d at 883 (citing *Omnitrition*, 79 F.3d at 781). The first part of the *Koscot* test can be satisfied by a required purchase to become a distributor, *see id.*, or a required purchase of non-returnable inventory to receive the full benefits of the program, *see Omnitrition*, 79 F.3d at 782. The second part of the *Koscot* test—rewards for recruitment unrelated to sales to ultimate users—is the *sine qua non* of a pyramid scheme because it "tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur." *Id.* at 781-82.

The incentivization of recruitment over retail sales can lead to "inventory loading"—the purchase of product for the purpose of remaining eligible for bonuses. *Id.* at 782 n.3. The multilevel marketing company Amway was not considered a pyramid scheme under the *Koscot* test in part because it enforced anti-inventory-loading safeguards, including: (a) a requirement that distributors sell at wholesale or retail at least 70% of the products bought in a given month to receive a bonus for that month (the "70% rule"); (b) a requirement that sponsoring distributors buy back from any person they recruited any unused, marketable product if the recruit left the business (the "buy-back rule"); and (c) a requirement that distributors submit proof of retail sales made to at least ten different customers to receive a bonus for that month (the "ten customer rule"). *In re Amway Corp.*, 93 F.T.C. 618, 716 (1979). The *Amway* safeguards were found to be effective as a matter of fact, not law, and thus are not one-size-fits-all. *Omnitrition*, 79

- 5 -

F.3d at 783. But "[t]he key to any anti-pryamiding rule . . . is that the rule must serve to tie recruitment bonuses to actual retail sales in some way." *Id.*

In evaluating whether the rewards paid to distributors come primarily from recruiting, rather than the sale of products to ultimate users, courts look beyond a company's policies and procedures and examine how the company operates in practice. *BurnLounge*, 753 F.3d at 883. Courts have treated the analysis of incentives tied to sales to ultimate users—a critical aspect of the second *Koscot* prong—on a case-by-case basis. In practice, distributors may themselves consume some inventory as ultimate users, and thus a program that permits internal consumption is not *per se* a pyramid scheme. *Id.* at 886-87. However, evidence that distributors purchase and consume product for the purpose of qualifying for recruitment incentives is evidence of a pyramid scheme. *See id.* In other words, as the FTC's expert, Dr. Bosley, correctly stated in her report, an ultimate user under the second *Koscot* prong is limited to one who would have purchased a product even if not for the income opportunity. *See id.* The FTC has explained:

> The critical question for the FTC is whether the revenues that primarily support the commissions paid to all participants are generated from purchases of goods and services that are not simply incidental to the purchase of the right to participate in a money-making venture.

*Id.* at 887 (quoting FTC Staff Advisory Opinion – Pyramid Scheme Analysis, dated January 14, 2004).

The evidence before the Court leaves little doubt that the FTC will ultimately succeed on the merits in demonstrating that Vemma is operating a pyramid scheme. With regard to the first *Koscot* prong, Vemma's bonus structure and training materials are designed to make new Affiliates buy a $600 Affiliate Pack, which makes payment for the right to sell a Vemma product if not a written requirement, a practical one. With regard to the second *Koscot* prong, the evidence shows that the bonuses Affiliates earn are primarily for recruitment of other Affiliates, not the sale of products.

In practice, Affiliates are very likely engaging in inventory loading. The great majority of Vemma product sales is to its Affiliates and, as Dr. Bosley noted, under the

current bonus system there is no way to unbundle the Affiliates' intent to consume Vemma products as ultimate users from their desire to remain qualified for bonuses— bonuses that are largely driven by recruitment of other Affiliates. But their intent in purchasing Vemma products must be viewed in light of Vemma's program design as well as its training and marketing materials, which explicitly provide that Affiliates should enroll in auto-delivery for the purpose of remaining qualified for bonuses. In all likelihood, Affiliates' purchases of Vemma products are incidental to the right to qualify for and obtain bonuses. *See BurnLounge*, 753 F.3d at 887-88.

Moreover, Vemma's purported anti-inventory-loading safeguards are neither effective nor enforced. *See Omnitrition*, 79 F.3d at 783. Vemma contacts only 15 of its over 90,000 Affiliates a month to ask if at least 70% of their sales were for consumption or retail. And Vemma's Vice President of Legal Affairs admitted in her testimony that the script for those calls does not really investigate the reason an Affiliate purchased product or check for inventory loading. Moreover, the Receiver found that, in practice, Vemma is five months behind on its inventory loading audits and has never suspended or disciplined an Affiliate who failed to make the requisite sales to ultimate users. And Vemma does not even attempt to apply a rule similar to the ten customer rule that was found to be a reliable way to control inventory loading in *Amway*.

Vemma contends that it has recently made changes to both its procedures—such as its anti-inventory-loading safeguards—and its training and marketing materials. As such, Vemma asserts that, because some of the FTC's evidence is not current, the evidence is insufficient to show Vemma is a pyramid scheme at the present time. Under Section 13(b) of the FTC Act, the FTC is entitled to injunctive relief only for continuing violations or violations that are likely to recur—"the statute does not mention past violations." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985). The FTC's evidence is certainly sufficient to show Vemma was operating an illegal pyramid scheme through 2014, and although evidence is not yet complete for 2015, the Court notes that Vemma's 2015 "Two & Go" program contains the same indices of pyramidal structure as

the former programs. Defendants have not produced evidence that the critical defects in their programs have been remedied since 2014, and the Court thus has no reason to believe at this stage that Vemma's violations of the FTC Act are not continuing or likely to recur in the absence of injunctive relief. In sum, the Court finds the FTC has again met its burden to show a likelihood of success on the merits in demonstrating Vemma and Mr. Boreyko are operating a pyramid scheme, even in light of the argument and evidence provided by these Defendants.

Separately, Tom Alkazin argues that the FTC has not met its burden to show he is liable under the FTC Act for Vemma's operation of a pyramid scheme, and the Court agrees. While the FTC has provided evidence of Mr. Alkazin's participation in the promotion of Vemma's business opportunities, there is no evidence that, even as a top Affiliate, he had control over Vemma's structure, operations, or bonus and compensation structure. *See FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1203-04 (C.D. Cal. 2000). Accordingly, the Court denies the FTC's request for a preliminary injunction against Mr. Alkazin with regard to the operation of an illegal pyramid scheme.

### 2.     False and Misleading Representations

The FTC raises three claims that Defendants made or provided false or misleading statements, namely, (1) that, in advertising, marketing, promoting, offering for sale, or sale of the right to participate in the Vemma program, Defendants misrepresented that Vemma Affiliates are likely to earn substantial income, (2) that, in the same contexts, Defendants failed to disclose that Vemma's structure ensures that most Affiliates will not earn substantial income, and (3) that Defendants furnished Vemma Affiliates with promotional materials—or "means and instrumentalities"—for use in the recruitment of new Affiliates that contained false or misleading representations. The FTC claims that Defendants' false and misleading representations violated the prohibition on deceptive acts contained in Section 5(a) of the FTC Act. *See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993). For the purpose

of determining if preliminary injunctive relief is appropriate, the Court considers these claims together.

### a.    Factual Findings

As is common in pyramid schemes, the evidence shows that most Vemma Affiliates have very low earnings—in both 2013 and 2014, more than 93% of Affiliates earned less than $6,200, and that amount does not account for their expenses in purchasing Vemma product to remain qualified for bonuses. However, the FTC provided the Court with numerous examples of Defendants' representations in print, web, audio, video, and live presentation of exorbitant Affiliate earnings. These representations are in advertising, promoting, recruiting and training materials available either to the public or to the internal Vemma Affiliate organization through "Back Office" content. Many representations have no "results not typical" disclaimer at all, and others have a disclaimer that is difficult, if not impossible to read, and in many instances is only intermittently flashed on the screen for a few seconds at a time. Likewise, content rarely indicates that the structure of the Vemma program ensures that the vast majority of Affiliates cannot achieve substantial income.

### b.    Legal Standards and Analysis

An income representation is deceptive under Section 5(a) of the FTC Act if (1) there was a representation, omission or practice, (2) that was likely to mislead customers acting reasonably under the circumstances, and (3) the representation, omission or practice was material. *Gill*, 265 F.3d at 956. Representations may be express or implied. *Figgie*, 994 F.2d at 604. A representation, omission or practice is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).

Courts consistently conclude that misrepresentations regarding income potential are material and violate the FTC Act. *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528-29 (S.D.N.Y. 2000). For instance, in communicating the earnings of its

distributors, an entity may not "make deceptive use of unusual earnings realized by only a few" without running afoul of the FTC Act. *Nat'l Dynamics Corp. v. FTC*, 492 F.2d 1333, 1335 (2d Cir. 1974). Likewise, a material omission as to income potential, such as a failure to disclose that the structure of a program ensures that the vast majority of consumers cannot achieve substantial income, is deceptive under the FTC Act. *Five-Star Auto Club,* 97 F. Supp. 2d at 532-33.

The "common-sense net impression" of representations controls. *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262 (E.D.N.Y. 1998); *see also Cyberspace.com*, 453 F.3d at 1200. Thus, representations may be misleading despite the use of a disclaimer such as "results may vary" if the consumer may reasonably believe that a statement of unusual earning potential represents typical earnings. *See FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1072 (C.D. Cal. 2012); *FTC v. Medicor, LLC*, 217 F. Supp. 2d 1048, 1054 (C.D. Cal. 2002).

Finally, "[t]hose who put into the hands of others the means by which they may mislead the public, are themselves guilty of a violation" of Section 5(a) of the FTC Act. *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963).

Defendants contend that the FTC offered to the Court only a small, and thus unrepresentative, portion of the universe of materials in which Defendants made income representations, but the Court disagrees. The FTC provided innumerable examples of Defendants referring to unusual earnings that can only be achieved by a select few within the Vemma structure in a way that made those earnings seem easily within reach to the reasonable listener. Defendants did so in every form—including print, web, audio, video, and live presentation—for every purpose—including advertising, promoting, recruiting and training—and to both the public and to the internal Affiliate organization through "Back Office" content. As but one snippet of one example, Alex Morton, a successful Vemma Affiliate, states the following in a recruitment video:

> You don't want to live life with no money. You want to have so much money it doesn't even matter. That's why people do Vemma, to have enough money to where it doesn't even matter anymore, guys. This is

already working. There's nothing you can say to contest this. You're either in or you're out. You're either in and you want to make a lot of money and live the life you want, or you're going to go out and do what everybody else does, oh, go to high school and get good grades, go to college, get good grades, make a resume, go beg someone to hire you, and you're told when to show up, when to eat lunch, when to pee, and when to go home. . . . Why does the day of the week even matter? The sun comes up, goes down, we make money while we're asleep. That's how Vemma works. You're paid 24 hours a day, seven days a week no matter what you are doing . . . That's what we're all about. And, yeah, you can make a million a year or a million a month.

(Doc. 12, App. 1415-18; *see also* Doc. 9 at 7-29; Docs. 10-14.)

While the Court recognizes that referring to a small portion of a presentation does not allow for a net impression, the Court has reviewed the myriad videos and other media provided by the FTC in their entirety, and they are replete with deceptive income statements such as those cited above. Some Vemma material also contains representations the Court would characterize as ridiculous—bordering on absurd—such that a listener could not reasonably be expected to believe them. But numerous Vemma content contains income representations that are likely to mislead consumers acting reasonably under the circumstances, and that content is thus deceptive under the FTC Act. *See Nat'l Dynamics Corp.*, 492 F.2d at 1335; *Five-Star Auto Club,* 97 F. Supp. 2d at 528-29. Likewise, the Vemma content on income potential cited by the FTC rarely informs its audience that the structure of the Vemma program ensures that the vast majority of Affiliates cannot achieve substantial income, which is a material omission. *See Five-Star Auto Club,* 97 F. Supp. 2d at 532-33.

Defendants argue that their content contains disclaimers such as "results not typical," and that newer content contains more disclaimers.[2] But numerous advertising,

---

[2] As an extension of this last point, Defendants argue that much of the material the FTC put forward to prove violations of the FTC Act does not reflect its more current materials, and therefore the FTC can show, at best, prior violations of the FTC Act, but has failed to prove ongoing violations. This argument fails. Although the abandonment of practices alleged to be unlawful does bear on whether a court should enjoin defendants, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case." *FTC v. Crescent Publishing Group, Inc.*, 129 F. Supp. 2d 311, 320 (S.D.N.Y. 2001) (internal citations omitted). Put another way, such voluntary

recruiting and training materials are still available both to the public and through the Vemma Back Office that contain misleading income statements with either no disclaimer or a disclaimer that is impossible for the reasonable viewer to notice, let alone read. In live presentations, when Vemma speakers include "results not typical" disclaimers with income representations, they often follow the disclaimer with a statement such as, "I hope you're not typical," to weaken the disclaimer. As a result, the net impression is still that a Vemma Affiliate is likely to earn substantial income, which is deceptive under the FTC Act. *See John Beck Amazing Profits*, 865 F. Supp. 2d at 1072; *Medico*, 217 F. Supp. 2d at 1054.

The FTC has also provided ample evidence that Vemma provides the "means and instrumentalities" for Affiliates to deceive consumers by providing them with promotional, recruiting and training materials containing false or misleading income representations, which is a further violation of the FTC Act. *See Waltham Watch*, 318 F.2d at 32.

Mr. Alkazin again attempts to distinguish his conduct from that of Vemma and Mr. Boreyko by arguing that he updated his Roadmap to Success Affiliate training brochure in 2015 to include an income chart and that the materials the FTC provided to the Court were not complete and did not include disclaimers and references to actual income statements. But the income chart included in the revised Roadmap to Success is both misleading and difficult for a reasonable consumer to understand, and it does not suffice as a means to inform consumers of their likely income as Vemma Affiliates. Moreover, as is the case for Vemma and Mr. Boreyko, content either available through Mr. Alkazin's website or sponsored by Mr. Alkazin, such as the Affiliate training event in Pleasanton, California entitled Super Saturday Business Opportunity, contained income representations that are deceptive under the FTC Act. Accordingly, Mr. Alkazin is not distinguishable from the other Defendants with respect to false and misleading representations.

---

cessation does not compel the Court "to leave the defendant free to return to his old ways." *Id.* (internal citations and quotes omitted).

The Court finds that, even in light of the argument and evidence provided by Defendants, the FTC has met its burden to show a likelihood of success on the merits in demonstrating Vemma, Mr. Boreyko and Mr. Alkazin are making material misrepresentations and omissions, as well as furnishing Vemma Affiliates with the means and instrumentalities to make material misrepresentations and omissions, in violation of the FTC Act.

### B. Balance of Equities

The FTC also has the burden to show that the balance of equities tips in its favor and that a preliminary injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24 (citing *Munaf v. Green*, 553 U.S. 674, 689-90 (2008)). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" paying particular attention to the public consequences. *Id.* (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

Congress enacted the FTC Act in part to combat consumer deception. *See Warner Commc'ns, Inc.*, 742 F.2d at 1165. The public interest in halting Defendants' deceptive acts under Section 5(a) of the FTC Act outweighs Defendants' interest in continuing to operate their private business. *See id.* As a result, the FTC is entitled to a preliminary injunction against Defendants. *See id.*

## II. FORM AND SCOPE OF PRELIMINARY INJUNCTIVE RELIEF

Evidence of Defendants' past conduct, including its seriousness and deliberate nature, leads this Court to conclude there is a substantial likelihood of continued unlawful practices in the absence of injunctive relief. *See Sears, Roebuck and Co. v. FTC*, 76 F.2d 385, 392 (9th Cir. 1982). District courts may employ the full range of equitable remedies incident to their power to grant injunctive relief sought by the FTC under Section 13(b) of the FTC Act. *FTC v. H.N. Singer, Inc.*, 668 F. 2d 1107, 1113 (9th Cir. 1982). As discussed below, this may include proscription of certain business practices, the

appointment of a receiver, an asset freeze and repatriation of assets. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (holding that "a District Court has considerable discretion in fashioning suitable relief and defining the terms of an injunction.").

But injunctive relief "must be tailored to remedy the specific harm alleged." *Id.* It should be "no more burdensome to the defendants than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and its terms narrowly focused "to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (internal quotation and citation omitted).

Viewing all the evidence in light of this case law, the Court concludes that measures less drastic than some of the relief the FTC seeks are available to remedy the harms shown. The Court's finding that some significant amount of Defendants' product is sold to persons not pursuing the business opportunity persuades it that, while the FTC has shown that aspects of Defendants' marketing program likely constitute unlawful activity as discussed above, not all aspects of the business are necessarily pyramidal or otherwise illegal. Thus, the Court will tailor injunctive relief to preclude components and practices of the Defendants' marketing program that would promote pyramid activity and misleading statements, but will not prohibit all business activity. The Court also will not order a Permanent Receiver, but will instead appoint a Monitor. Finally, the Court will unfreeze corporate and individual financial accounts, although it will restrain the alienation of certain other assets to ensure their availability to satisfy monetary relief, should same be awarded after a trial on the merits.

### A. Prohibition of Certain Promotional and Marketing Program Practices

The Court will enjoin those aspects of Defendants' program promotion that implicate false and misleading representations, including making any representations about income potential without adequate disclaimers and ready referral to accurate income potential disclosures. The Court notes again that Defendants' current and past

disclaimers and references to income statements are inadequate, and Defendants must remedy the inadequacies not only in their processes but also in their actual practices. The Court will require Defendants to remove all non-compliant material from its "Back Office" websites, all other web-based and other repositories for training and promotional material, and to undertake diligent efforts to require all Affiliates to do the same. The injunctive relief will also include, as Defendants offered in their proposal to avoid appointment of a receiver, a prohibition against the use or distribution of any promotional, sales or advertisement material that has not been provided to the FTC for review and right of objection in advance.

Regarding the pyramid scheme, the Court will enjoin those features of Defendant's Marketing Program and bonus structure that tie bonuses primarily to recruiting and to the purchase of product principally to stay eligible for those bonuses. As described in more detail in the Orders below, this will include a prohibition of the sale of Affiliate Packs, and the linking or tying of an affiliate's eligibility for bonuses or accumulation of qualifying points to their own purchases of Vemma product, whether through participation in the auto-delivery program or otherwise.[3] The injunction will also encompass the "Two & Go" Program, which falls under the above prohibition.

**B.    Court-Appointed Monitor**

The FTC requested that, as part of any preliminary injunction, this Court continue the Temporary Receiver's appointment established in the TRO and convert it to a Permanent Receiver to oversee the corporate defendants and their assets and affairs through the conclusion of this matter. The appointment of a receiver is a recognized form of relief in cases involving injunctive relief for alleged violations of the FTC Act. *FTC v.*

---

[3] The Court acknowledges the holding of *BurnLounge*, that when participants bought packages in part for internal consumption, the participants were the "ultimate users" of the merchandise, and that such internal sale alone does not make a multilevel marketing program a pyramid scheme. 753 F.3d at 887. But where, as here, there is a likelihood that such purchases are bundled in the minds of a substantial number of participants with maintaining eligibility for bonuses—because that is precisely what Defendants told them was the purpose of, for example, signing up for the auto-delivery program—it is likely that this aspect of Defendant's business constitutes a pyramid scheme under the facts of this case.

*Am. Nat'l Cellular*, 810 F.2d 1511, 1512-14 (9th Cir. 1987). But it is "an extraordinary remedy, to be employed cautiously and usually when no lesser relief would be effective." *Rosen v. Seigel*, 106 F.3d 28, 33-34 (2d Cir. 1997). Because more tailored, less restrictive measures as set forth above and below will adequately protect the public interest, the Court concludes that a receivership is no longer justified.

The Court will appoint a Monitor. Federal courts repeatedly have approved the use of a special master to monitor compliance with court orders and consent decrees. *Stone v. City and Cnty. of S.F.*, 968 F.2d 850, 859 n.18 (9th Cir. 1992). In this case, counsel for Defendants themselves suggested monitoring as an alternative to receivership. The Court will appoint Robb Evans and Associates, LLC (REA) as Monitor in this matter. If REA is for any reason unable or unwilling to serve as Monitor, the FTC will inform the Court within forty-eight hours of learning this fact, and a different Monitor will be appointed.

The appointed Monitor will be charged with observing Defendants' business practices to ensure that the Corporate Defendants are complying with the preliminary injunction, and is to have access to all operations and records of the Corporate Defendants. The Monitor shall also observe whether the Corporate Defendants' assets are properly spent on ordinary and necessary business expenses. The Monitor will not have direct control over the Corporate Defendants' business operations or assets, but if a violation of the Preliminary Injunction were observed, the FTC is authorized to seek an appropriate remedy from the Court.

## C.   Accounts and Assets of Corporate Defendants and Defendant Boreyko

The FTC seeks to maintain the asset freeze originated in the TRO to ensure that alleged wrongdoing may be adequately compensated in the event the FTC prevails at trial on the merits. An asset freeze is within the District Court's equitable powers. *FTC v. Gem Merchandise Corp.*, 87 F.3d 466, 469 (11th Cir. 1996). But "a party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Here, the FTC has shown no evidence Defendants have ever

previously attempted to intentionally dissipate or hide either corporate or personal assets from an effort to collect a debt or judgment against them. The FTC argues that because Defendants have committed misrepresentation tantamount to fraudulent acts in their promotion of the Vemma Marketing Program, they likely will dissipate their assets to thwart potential collection activity. This does not satisfy the burden of demonstrating that an asset freeze is warranted. While courts have considered fraudulent activity as a factor in support of a likelihood of dissipation, *see SEC v. Manor Nursing Ctrs, Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972), that fraudulent activity must be something more than the defendants' misleading marketing practices that are the subject of the injunctive action. *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-cv-4719-FMC-FFMx, 2009 WL 7844076, at *15 (C.D. Cal. Nov. 17, 2009). As the district court in *John Beck* pointed out, if a defendant's purported misleading marketing practices "were sufficient to support an asset freeze, one would issue in every deceptive advertising case." *Id.*

Moreover, the Court must consider whether the freezing of assets "might thwart the goal" of compensating those owed money "if the freeze were to cause such disruption of defendants' business affairs that they would be financially destroyed." *FTC v. Willms*, No. C11-828 MJP, 2011 WL 4103542, at *11 (W.D. Wash. Sept. 13, 2011) (internal quotations and citations omitted). This Court's other injunctive provisions, which shall remain in place pending trial, reduce or minimize the likelihood of future violations, and therefore the creation of further loss to consumers. The focus, then, is on the prospect of substantial monetary recovery for Defendants' past actions should the FTC prevail at trial. The FTC's legitimate concerns about the availability of assets to redress any harm caused by those past actions may be addressed through the less drastic measure of enjoining the dissipation of assets by all Defendants. This will be accomplished by the Monitor's reporting to the FTC and the Court on the business operations and expenditures of the Corporate Defendants, and by an injunction against the alienation by Defendant Boreyko of any of his real estate holdings during the pendency of this action. All bank accounts and other financial accounts frozen by the TRO will be unfrozen upon

1  its expiration, and the FTC shall serve a copy of this Order on all subject financial

2  institutions and third parties affected by it.

3       The Court is mindful that allowing the Corporate Defendants to resume operation

4  of their business and unfreezing associated accounts and assets presents a possibility that

5  the business will not succeed and, in that event, if the FTC ultimately is successful on the

6  merits of this case, there would be less money available to satisfy victims.[4] But Vemma's

7  testimony and argument in their briefing that they are capable of, and intend to, operate

8  the business even under the provisions this Court found necessary to safeguard against

9  violations of the FTC Act, supported by evidence that there is some demand for the

10  product when unbundled from the business opportunity, leads the Court to conclude it is

11  appropriate to allow the business to move forward in that fashion. The injunction will not

12  contain a freeze on any of Defendants' financial accounts.

13

14  **PRELIMINARY INJUNCTION**

15  **DEFINITIONS**

16       For the purposes of this Order, the following definitions apply:

17       A.    **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is

18  difficult to miss (*i.e.*, easily noticeable) and easily understandable by ordinary consumers,

19  including in all of the following ways:

20

21

22  [4] Such a failure may occur for any or all of the following reasons. First, Vemma's financial statements indicated they were already losing money during the past 18 months.

23  The companies' 2014 Consolidated Financial Report showed a loss before depreciation of approximately $2.2 million, and the income statement for the first six months of 2015

24  showed an additional loss of about $1.4 million. (Doc. 50, Temporary Receiver's Report at 1.) During this period, the companies also lost substantial numbers of Affiliates.

25  Second, going forward, the injunction's prohibition against incentives for recruiting over product sales and misleading promotional statements may result in a critical decrease in

26  persons interested in the business opportunity without its pyramidal aspects. This of course would present some proof of the FTC's allegations that persons participated in the

27  Affiliate venture only to obtain bonuses tied primarily to recruitment. Third, the provisions of the expiring TRO may have caused the loss of substantial income and

28  numbers of Affiliates. While all parties will have their narratives in the event of a failure, the precise contribution of these factors to any failure would be unknowable.

1.     In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.     A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.     An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.     In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.     On a product label, the disclosure must be presented on the principal display panel.

6.     The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

7.     The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

8.     The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

9.     When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that audience.

B.     **"Defendants"** means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

1.     **"**Individual **Defendants"** means Benson K. Boryeko a/k/a B.K. Boryeko and Tom Alkazin, and by whatever other names each may be known.

2.     **"Corporate Defendants"** means Vemma Nutrition Company and Vemma International Holdings, Inc., and their successors and assigns, as well as any subsidiaries, fictitious business entities, or business names created or used by these entities, or by entities owned or controlled by the Individual Defendants, that are related to, or receive funds from, the sale of health and wellness products or business opportunities related to health and wellness products.

C.     **"Document"** means the complete original and any non-identical copy (whether different from the original because of notations or otherwise) of any electronically stored information or filed, graphic, imaged, printed, punched, texted, transcribed, typed, or written matter of every type and description, including, but not limited to, writings, drawings, graphs, charts, photographs, sound records, images, and other data or data compilations that are stored in any medium from which information can be obtained either directly or indirectly or, if necessary, translated into a reasonably usable form.

D.     **"Marketing Program"** includes, but is not limited to, any multi-level marketing program, business opportunity, pyramid marketing scheme, Ponzi scheme, or chain marketing scheme.

E.     **"Material"** means likely to affect a person's choice of, or conduct regarding, goods or services.

F.     **"Person"** means an individual, organization, financial institution, or other legal entity, including, but not limited to, an association, cooperative, corporation, limited liability company, partnership, proprietorship, or trust, or combination thereof.

G.     **"Monitor"** means the monitor appointed in Section VI of this Order, below, and any deputy monitors that shall be named by the Monitor.

## ORDER

**IT IS HEREBY ORDERED** granting in part and denying in part Plaintiff FTC's Motion for a Preliminary Injunction with Asset Freeze in this matter (Doc. 4).

**IT IS FURTHER ORDERED** as follows:

**I.     PROHIBITED BUSINESS ACTIVITIES**

Corporate Defendants and their officers, agents, employees, and attorneys, including Defendant Boreyko, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, or operation of any Marketing Program, are preliminarily restrained and enjoined from:

A.     Engaging in, participating in, or assisting others in engaging in or participating in, any Marketing Program that:

1.     Pays compensation for recruiting new members;

2.     Encourages or incentivizes members to purchase goods or services to maintain eligibility for bonuses, rewards, or commissions rather than for resale or personal use;

3.     Induces others to encourage or incentivize members to purchase goods or services to maintain eligibility for bonuses, rewards, or commissions rather than for resale or personal use;

4.     Pays any compensation related to the purchase or sale of goods or services unless the majority of such compensation is derived from sales to or purchases by persons who are not members of the Marketing Program;

5.     Constitutes a pyramid scheme; or

6.     With specific reference to Corporate Defendants' existing Marketing Program:

a.     sells Affiliate Packets;

b.     links or ties an Affiliate's eligibility for bonuses, or the Affiliate's accumulation of bonus qualifying points, to that Affiliate's

purchase of the Corporate Defendants' product, such as through auto-delivery or Two & Go;

B.     Misrepresenting, or assisting others in misrepresenting, directly or indirectly, expressly or by implication, any material fact, including, but not limited to, that consumers who participate in a Marketing Program will or are likely to receive substantial income;

C.     Failing to disclose, clearly and conspicuously, to any prospective member in any Marketing Program to whom any earnings, profits, or sales volume claims have been made:

1.     The number and percentage of Marketing Program members who have made a profit through their participation in the Marketing Program;

2.     The beginning and ending dates when the represented earnings, profits, or sales volume were achieved; and

3.     The average and median amount of profit made by each Marketing Program member;

D.     Furnishing materials to be used in recruiting new members in a Marketing Program that contain false or misleading representations; and

E.     Publishing or disseminating any new marketing or sales materials without prior delivery to the FTC and a five (5) day period for the FTC to review the materials. If the FTC objects to any such materials, Defendants will not use such materials absent approval of the Court, which Defendants shall seek through motion.

## II.     PRESERVATION OF RECORDS AND REPORT OF NEW BUSINESS ACTIVITY

Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, are preliminarily restrained and enjoined from:

A.     Failing to maintain accounts, bank statements, books, cash disbursements ledgers and source Documents, cash receipts ledgers, current accountants' reports,

Documents indicating title to real or personal property, general journals, general ledgers, records, and any other data which, in reasonable detail, accurately and fairly reflect the disbursements, dispositions, incomes, transactions, and uses of Defendants' Assets;

B.      Altering, concealing, destroying, erasing, mutilating, transferring, or otherwise disposing of, in any manner, directly or indirectly, any Documents that relate in any way to the business practices or business or personal finances of Defendants; to the business practices or finances of entities directly or indirectly under the control of Defendants; or to the business practices or finances of entities directly or indirectly under common control with any other Defendant; and

C.      Creating, operating, or exercising any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship or corporation, without first providing the FTC with a written statement disclosing: (1) the name of the business entity; (2) the address, telephone number, e-mail address, and website address of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities.

**III.    PROHIBITION ON DISCLOSING CUSTOMER INFORMATION**

Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, are preliminarily restrained and enjoined from:

A.      Leasing, renting, or selling the address, bank account number, birth date, credit card number, e-mail address, name, Social Security number, telephone number, or other financial or identifying personal information of any person from whom or about whom any Defendant obtained such information in connection with the advertising, marketing, promoting, offering for sale, sale, or provision of a good, service, or program; and

B.      Benefitting from the address, bank account number, birth date, credit card number, e-mail address, name, Social Security number, telephone number, or other financial or identifying personal information of any person from whom or about whom any Defendant obtained such information in connection with the advertising, marketing, promoting, offering for sale, sale, or provision of a good, service, or program.

*Provided, however*, that Defendants may disclose such financial or identifying personal information to a law enforcement agency or as required by any law, regulation, or court order.

IV.    **ASSET PRESERVATION**

A.      Corporate Defendants shall not transfer or dispose of any material assets (beyond ordinary course sales and related transactions) without prior notice to the Court and FTC.  If the FTC objects to any proposed asset disposition, the Corporate Defendants will not proceed with such disposition absent approval form the Court; and

B.      Defendant Boreyko and his agents, employees, and attorneys, and all other persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, are preliminarily restrained and enjoined from assigning, concealing, converting, disbursing, dissipating, encumbering, liquidating, loaning, pledging, selling, spending, transferring, or otherwise alienating any real estate asset that is owned or controlled by, or held for the benefit of, Defendant Boreyko, directly or indirectly.

V.     **FINANCIAL STATEMENTS, REPORTING AND ACCOUNTING**

A.      Corporate Defendants and Defendant Boreyko shall each, within three (3) months after service of this Order, and quarterly thereafter, prepare and provide to the FTC and the Monitor complete and accurate updated financial statements, on the forms attached as Attachments A and B to the TRO (Doc. 25), disclosing all personal Assets and Assets of corporations, partnerships, trusts or other entities that Corporate Defendants or Defendant Boreyko own or control, jointly or individually; and

B.      Corporate Defendants shall file regular quarterly reports, commencing three (3) months after service of this Order, with the Court and the FTC describing in detail the business operations, including all sales and cash inflows and outflows.

## VI.   APPOINTMENT OF MONITOR

Robb Evans, together with his firm Robb Evans & Associates LLC, is appointed Monitor for the Corporate Defendants, with the authority and duty to observe the Corporate Defendants' business practices to ensure that they are complying with the Preliminary Injunction, and is to have access to all operations and records of the Corporate Defendants. The Monitor also shall observe whether the Corporate Defendants' assets are properly spent on ordinary and necessary business expenses. The Monitor shall be the agent of this Court when so serving under this Order, and shall comply with the Federal Rules of Civil Procedure and Local Rules of this Court.

## VII.  ACCESS TO BUSINESS PREMISES AND RECORDS

A.      Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, shall allow the FTC and Monitor, and their respective representatives, agents, attorneys, investigators, paralegals, contractors, or assistants immediate access to:

1.      The business premises and storage facilities owned, controlled, or used by any Corporate Defendant, including, but not limited, to the offices and facilities at or in the vicinity of 1621 W. Rio Salado Parkway, Tempe, Arizona;

2.      Any premises where the Corporate Defendants conduct business, manufacturing, sales operations, or customer service operations; and

3.      Any premises where Assets or Documents related to the Corporate Defendants' businesses are stored or maintained;

B.      The purpose of the immediate access shall be to inspect and copy the business and financial Documents of the Corporate Defendants, including, but not limited to, forensic imaging of electronically stored information. Such business Documents

include, but are not limited to, correspondence, contracts, sales records, and financial data;

C.      The Monitor and the FTC shall have the right to remove any Documents related to Defendants' business practices from the premises in order that they may be inspected, inventoried, and copied. The materials so removed shall be returned within two (2) business days of completing said inventory and copying; and

D.      The Monitor shall have the discretion to determine the time, manner, and reasonable conditions of access to the Corporate Defendants' premises.

## VIII.   COOPERATION WITH THE MONITOR

Corporate Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, shall fully cooperate with and assist the Monitor by promptly responding to inquiries and providing all information to which the Monitor is entitled under this Order.

## IX.   NON-INTERFERENCE WITH THE MONITOR

Corporate Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are preliminarily restrained and enjoined from refusing to cooperate with the Monitor or the Monitor's duly authorized agents in the exercise of their duties or authority under any order of this Court.

## X.   MONITOR'S REPORTS

The Monitor shall report to this Court as necessary regarding any matters that the Monitor believes should be brought to the Court's attention.

## XI.   COMPENSATION OF MONITOR

The Monitor, and all persons hired by the Monitor as authorized by this Order, are entitled to reasonable compensation for the performance of duties undertaken pursuant to this Order, and for the cost of actual out-of-pocket expenses incurred by them solely from the Assets now held by or in the possession or control of, or which may be received by,

the Corporate Defendants. The Monitor shall file with the Court and serve on the parties requests for the payment of such reasonable compensation bi-monthly.

## XII.   DISTRIBUTION OF ORDER BY DEFENDANTS

Defendants shall immediately provide a copy of this Order to each affiliate, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, servant, attorney, subsidiary, division, and representative of any Defendant. Within five (5) business days following service of this Order, Defendants shall serve on the FTC an affidavit identifying the name, title, address, telephone number, date of service, and manner of service of each person Defendants have served with a copy of this Order in compliance with this provision.

## XIII.   RETENTION OF JURISDICTION

This Court shall retain jurisdiction of this matter for all purposes.

Dated this 18th day of September, 2015.

_____
Honorable John J. Tuchi
United States District Judge